# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**CAIR-FOUNDATION, INC. and**
**CAIR-FLORIDA, INC.,**

     *Plaintiffs*,

**v.**

                              **Case No. 4:25-cv-00516-MW-MJF**

**RONALD DESANTIS, in his official**
**capacity as Governor, State of Florida,**

     *Defendant*.

_____

## FIRST AMENDED COMPLAINT FOR
## <u>DECLARATORY AND INJUNCTIVE RELIEF</u>

### INTRODUCTION

Plaintiffs CAIR-Foundation, Inc. and CAIR-Florida, Inc. bring this First Amended Complaint for Declaratory and Injunctive Relief against Defendant Ronald DeSantis, in his official capacity as Governor of the State of Florida. On December 8, 2025, Defendant issued Executive Order 25-244 (the "Executive Order"), attached as Exhibit A. The Executive Order is unlawful on its face, exceeds Defendant's authority, was issued without any notice or opportunity to be heard, was issued for improper purposes, and imposes immediate, self-executing legal disabilities and impairments on Plaintiffs in violation of their First and Fourteenth Amendment rights. Plaintiffs seek a declaration that the Executive Order is unlawful,

1

unconstitutional, void, and of no force or effect, and an injunction prohibiting its enforcement and continued maintenance and ordering that CAIR be stricken from the Executive Order in all respects. Plaintiffs respectfully allege as follows:

## PARTIES

1.    Plaintiff CAIR-Foundation, Inc. ("CAIR" or "CAIR National") is a District of Columbia nonprofit corporation and 501(c)(3) tax-exempt organization headquartered in Washington, D.C., and an expressive association engaged in civil rights advocacy.

2.    Plaintiff CAIR-Florida, Inc. ("CAIR-Florida") is a Florida nonprofit corporation and 501(c)(3) tax-exempt organization headquartered in Tampa, Florida, and an affiliated chapter of CAIR.

3.    Defendant Ronald DeSantis is the Governor of the State of Florida, who issued Executive Order 25-244 asserting that it was issued pursuant to his constitutional duty to take care that the laws be faithfully executed and to preserve the public peace, and who is responsible for its execution and ongoing implementation. He is sued in his official capacity for declaratory and prospective injunctive relief.

## JURISDICTION AND VENUE

4.    This action arises under the Constitution and laws of the United States, in-
cluding the First and Fourteenth Amendments, and 42 U.S.C. § 1983. This
Court has federal question jurisdiction under 28 U.S.C. § 1331.

5.    An actual and justiciable controversy exists within the meaning of 28 U.S.C.
§ 2201, and this Court is authorized to grant declaratory and injunctive relief
to redress ongoing, immediate, and imminent constitutional violations under
28 U.S.C. §§ 2201-2202.

6.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a sub-
stantial part of the events giving rise to the claims occurred within this Dis-
trict, including the issuance, publication, and implementation of the Executive
Order.

## FACTUAL BACKGROUND

### A.    *CAIR and CAIR-Florida and Their Mission*

7.    Founded in 1994, the Council on American-Islamic Relations ("CAIR" or
"CAIR National") is America's largest Muslim civil rights and advocacy or-
ganization. Its faith-driven mission is to enhance the public's understanding
of Islam, protect and vindicate civil rights, promote justice, and empower
American Muslims through lawful advocacy and expressive activity protected
by the First Amendment.

8.    CAIR National is a 501(c)(3) nonprofit organization registered as CAIR-Foundation, Inc. and operates in Florida and nationwide.

9.    CAIR-Florida is a 501(c)(3) nonprofit organization registered as CAIR-Florida, Inc., and is an affiliated chapter of CAIR National. In association with CAIR, CAIR-Florida has engaged in, and intends to continue engaging in, advocacy, education, and civic participation in Florida.

10.    CAIR National and its more than 20 affiliated chapters, including CAIR-Florida, work, and intend to continue working, to advance CAIR's mission through advocacy on cultural, social, nonpartisan political, and civic issues of public concern to American Muslims related to religious tolerance and understanding, cultural education, civil rights, and public policy in furtherance of its mission ("advocacy"). This advocacy includes legal action, including litigation in state and federal courts, and public policy advocacy, training, education, community organizing, interfaith work, and public commentary directed at federal, state and local executive and legislative government officials and the public.

11.    Employees of CAIR and CAIR-Florida regularly appear on and are quoted in national and local broadcast, print, and digital media outlets to discuss, debate, inform, and provide commentary on issues of public concern as part of their public education and advocacy efforts. Plaintiffs regularly issue press releases

and action alerts and hold press conferences as a part of their advocacy efforts. In addition, Plaintiffs regularly make posts, including tagging government officials and influencers, on social media outlets, like X, Instagram, and Facebook, to communicate as part of their advocacy efforts. Plaintiffs also regularly engage in meetings with local, state, and federal government officials, other organizations, civic groups, and religious institutions, and members of the public as part of their advocacy efforts. Plaintiffs attend and participate in local and state public meetings, including school boards, city and county commissions, and legislative committee meetings as part of their advocacy efforts. CAIR and CAIR-Florida may engage in these activities in support of their advocacy efforts individually or jointly and in some instances CAIR-Florida may do so alone but on behalf of itself and CAIR.

12. CAIR-Florida and CAIR have associated and intend to continue associating with each other without CAIR-Florida being subjected to the Executive Order's sanctions for doing so on the theory that such association constitutes provision of "material support or resources" to CAIR. Plaintiffs intend to continue associating through joint participation in events such as Muslim Day at the Florida legislature and Ramadan events, as well as through their ordinary, ongoing activities.

**B.      CAIR's and CAIR-Florida's Lawful Advocacy for Palestinian Human Rights**

13.   As an important component of its longstanding civil rights mission, CAIR National and CAIR-Florida have engaged in and intend to continue engaging in public speech, expressive association, advocacy, and litigation in support of Palestinian human rights and in defense of the First Amendment rights of individuals and organizations advocating for Palestinian human rights, matters of public concern.

14.   For example, CAIR's and CAIR-Florida's work includes direct legal representation of, and advocacy for, Students for Justice in Palestine ("SJP") chapters targeted with governmental suppression of their exercise of freedom of speech and assembly, including by Defendant, based on their disfavored viewpoints in support of Palestinian human rights.

15.   Plaintiffs' advocacy is carried out through speech that rests on the highest rung of the hierarchy of First Amendment values and is therefore provided with the most protection.

16.   In November 2023, CAIR National and CAIR-Florida sued[1] Florida officials, including Defendant, on behalf of a local SJP student organization at the University of South Florida, challenging a state directive concluding that SJP

---

[1] *Students for Justice in Palestine at the University of South Florida v. DeSantis*, No. 1:23-cv-00281 (N.D. Fla. 2023).

chapters at Florida public universities must be deactivated. The directive was issued by the Chancellor of the State University System in consultation with Defendant, who previously had publicly called for the student groups to be banned. That litigation sought injunctive relief to protect students' First Amendment rights to engage in pro-Palestinian advocacy and criticism of Israeli government policies that harm Palestinian human rights, without fear of government retaliation.

17.    Beyond the SJP litigation, CAIR and CAIR-Florida have played a leading role in defending the civil rights of individuals and organizations advocating for Palestinian human rights, including by challenging governmental actions, institutional bans, and discriminatory enforcement arising from criticism of Israeli government conduct.

18.    For example, CAIR and CAIR-Florida engaged in an advocacy campaign to bring back Mohammed Ibrahim—a 16-year-old U.S. citizen from Florida—who has been unjustly detained by Israel since February 2025. Part of the campaign included CAIR joining an August 2025 letter with more than 100 U.S. faith-based, human rights, and civil rights organizations to U.S. Secretary of State Marco Rubio calling for urgent action to secure Mr. Ibrahim's release from Israeli custody through lawful diplomatic channels.

19.   CAIR and CAIR-Florida also issued a March 2025 public statement condemning an effort by the Mayor of Miami Beach, Florida to prevent a movie theater from showing an Oscar-winning Palestinian documentary based on its viewpoint.

20.   In April 2025, CAIR sent a letter to the U.S. Department of Justice calling on it to prosecute the murder of an American citizen by Israeli settlers. CAIR also issued a February 2025 press release challenging President Donald Trump's assertion that the "U.S. will take over the Gaza Strip" and "own it," expressing opposition to that policy position.

21.   CAIR and CAIR-Florida often petition state officials through established legal processes to seek accountability for crimes targeting individuals based on their support for Palestinian human rights. For example, in March 2025, CAIR and CAIR-Florida issued a press release and action alert urging Florida residents to request that State Attorney Amira D. Fox pursue hate crime charges in connection with vandalism motivated by pro-Palestine speech.

### C.    *CAIR's and CAIR-Florida's Faith-based Activities and Advocacy*

22.   In furtherance of their faith-driven mission, CAIR and CAIR-Florida engage in core speech to educate, empower, and defend Muslim Americans on matters of public concern. For example, CAIR and CAIR-Florida create and

disseminate Know Your Rights materials for Muslims who face discrimination in the workplace and at elementary, secondary, and post-secondary schools.

23.    CAIR and CAIR-Florida regularly visit mosques to educate Muslims on their rights and to inform them about CAIR and CAIR-Florida's pro bono legal services through outreach. During Ramadan, one of the holiest and most important months of the year for Muslims, CAIR and CAIR-Florida create specialized programing that includes how to request accommodations at work and at school. CAIR and CAIR-Florida also often reach out to Florida correctional facilities to remind them of their duty not to curtail the rights of Muslims in their custody who seek to fast during Ramadan in accordance with federal and state law.

24.    CAIR and CAIR-Florida empower and educate Muslims to be civically engaged through participation in the democratic process. CAIR hosts Muslim Advocacy Day at the U.S. Capitol, which brings Muslims from across the country, including from Florida, to engage in advocacy with their members of Congress. CAIR also partners with CAIR-Florida for Muslim Day at the Florida state legislature, an advocacy event conducted in publicly available Capitol facilities in Tallahassee, Florida, to engage with state legislators. The 2025

event focused on free speech, public safety, criminal justice reform, and Muslim American heritage.

25.    CAIR-Florida requested to use, but was denied, publicly available space at the Florida State Capitol for its 2026 Muslim Day, scheduled to occur in February during the legislative session. Advocacy in opposition to proposed House Bill 119, also known as the "No Shari'a Act," is expected to be a part of the 2026 Muslim Day, assuming it can still be held. Recruiting participation in these activities is an important part of CAIR and CAIR-Florida's public policy advocacy and petitioning of government officials.

26.    CAIR and CAIR-Florida also encourage eligible American Muslims to register to vote to expand the electorate and then to exercise their right to vote in local, state, and federal elections through nonpartisan civic engagement efforts. As a part of that process, CAIR and CAIR-Florida educate and inform voters about their views on the relevant issues at stake in the election as well as about the election process itself, including when and where to vote.

27.    CAIR and CAIR-Florida's advocacy and public education also include participation in interfaith organizations and association, and engagement with members of the public, the media, government officials, and leaders of other faiths to educate them about Islam and to dispel and counter stereotypes, prejudices, false tropes and narratives, disinformation, and misinterpretations of Islamic

tenets, including with respect to sharia law,[2] which is frequently invoked in political discourse.

28. CAIR's and CAIR-Florida's advocacy, public education, community outreach, civil rights, and charitable work depend on ongoing association, interaction, and coordination with individual members of the public, other organizations, and businesses as an essential predicate to engaging in protected speech, association, and petitioning activity.

### D.    CAIR's and CAIR-Florida's Message of Nonviolence

29. Through public education and advocacy, CAIR and its affiliates, including CAIR-Florida, address and oppose narratives that portray Islam or American Muslims as inherently prone to violence, authoritarianism, religious intolerance, antisemitism, or extremism.

30. For decades, CAIR and CAIR-Florida have publicly and consistently condemned all forms of unjust violence, including hate crimes, terrorism, ethnic cleansing, and genocide committed by organizations designated by the United States as Foreign Terrorist Organizations without exception. ISIS, a U.S. designated Foreign Terrorist Organization pursuant to federal law, once

---

[2] Sharia refers to the body of Islamic religious principles derived from Islamic sources, including the Quran and prophetic tradition, which guide personal religious observance, ethics, and aspects of daily life for Muslims. It does not constitute a system of civil or criminal law in the United States.

threatened to assassinate CAIR's leadership because of CAIR's outspoken opposition to violence and terrorism.

31.    While CAIR and CAIR-Florida have consistently condemned U.S. support for the Israeli government's human rights abuses against the Palestinian people as a matter of public policy advocacy, CAIR and CAIR-Florida have also condemned Hamas violence against Israeli civilians, including suicide bombings in the 1990s and its attacks on October 7, 2023.

32.    Neither CAIR nor CAIR-Florida has ever been designated as a Foreign Terrorist Organization, Specially Designated Global Terrorist, or any comparable entity by the U.S. Department of State, the U.S. Department of the Treasury, or any other federal agency authorized to make such determinations under U.S. law. Nor have CAIR or CAIR-Florida ever been investigated, prosecuted, indicted, or convicted for any act of violence, terrorism, or material support for terrorism by any Florida law enforcement agency under Florida law.

**E.    Defendant's Knowledge of and Opposition to CAIR's and CAIR-Florida's Advocacy**

33.    CAIR's and CAIR-Florida's advocacy for Palestinian human rights and opposition to state efforts to suppress such expression have placed, and continue to place, them in direct and public conflict with Defendant and positions he has taken on matters of public concern.

34.   CAIR's and CAIR-Florida's advocacy against Islamophobia, including with respect to sharia law, and their educational efforts related to Islam have placed, and continue to place, them in direct and public conflict with Defendant and positions he has taken regarding Muslim civil rights and religious freedom and tolerance.

35.   CAIR-Florida has challenged Defendant on other policies through public advocacy and correspondence. For example, in February 2025, CAIR-Florida issued a letter to Defendant following a press conference in which he criticized documented immigrants, reminding him that "Florida's economy runs on immigrant labor."

36.   In October 2023, Defendant publicly stated that Palestinian refugees from Gaza were "all antisemitic."

37.   Defendant has publicly minimized concerns about Islamophobia and portrayed Muslim civil rights advocacy as suspect. During a nationally televised debate in November 2023, Defendant referred to efforts to combat Islamophobia as addressing "so-called Islamophobia" and stated that harassment of Muslims in the United States was not a real issue.

38.   In January 2024, during his presidential campaign, Defendant's campaign website, under the heading "Ron DeSantis Stands with Israel," described his views on Israel and Palestine. The website stated that "Ron DeSantis has

expressed unequivocal support for Israel and the Jewish people and has taken strong actions to stand by their side" and stated as an example that "DeSantis' admin directed Florida universities to enforce the law and terminate student chapters, such as National Students for Justice in Palestine (National SJP), that support Hamas' terrorism, which the website characterized as a felony under Florida law." Consistent with these statements, Defendant publicly called for SJP chapters at Florida universities to be banned based on their expressive activity and viewpoints.

39.    On October 8, 2025, via a post on the social media platform X (formerly Twitter), Defendant endorsed Florida House Bill 119 ("HB 119"), also known as the "No Shari'a Act", pre-filed the same day for consideration during the upcoming 2026 legislative session by Representative Hillary Cassel, stating, "Sharia law has no place in the USA and is incompatible with the Constitution."

40.    On October 14, 2025, CAIR and CAIR-Florida in a joint press release publicly opposed HB 119 and Defendant's endorsement of it. In that release, Plaintiffs sharply criticized Defendant's support for the bill, including by characterizing HB 119 as a discriminatory and anti-Muslim measure, condemning Defendant's endorsement as harmful to religious freedom, and calling on Florida lawmakers and the public to reject the bill through lawful civic action. The release

expressly criticized Defendant personally and politically, challenged his priorities and leadership, and urged continued public opposition.[3]

41.    On December 1, 2025, through a post on X, Defendant shared a Fox News article about the death of a Muslim woman in the Netherlands, which suggested that her family allegedly targeted her for not wearing a hijab (or headscarf). Defendant's comment accompanying the article was, "The wages of sharia…," despite the article itself not referencing sharia law.

42.    On December 8, 2025, again through a post on X, Defendant publicly announced the issuance of the Executive Order, including by posting an image of the Order and stating under the heading "EFFECTIVE IMMEDIATELY", "Florida is designating the Muslim Brotherhood and the Council on American-Islamic Relations (CAIR) as foreign terrorist organizations. Florida agencies are hereby directed to undertake all lawful measures to prevent unlawful activities by these organizations, including denying privileges or resources to anyone providing material support."

43.    Defendant's post inaccurately stated that the Executive Order designated CAIR as a "foreign terrorist organization" when the Order in fact purported to designate CAIR as a "terrorist organization." This inaccuracy has been

---

[3] *See* CAIR & CAIR-Florida Press Release (Oct. 14, 2025) (describing HB 119 as "disgraceful and bigoted," rooted in "lies, fearmongering, and political distraction," calling Defendant's endorsement "political cowardice and moral failure," and urging public opposition).

repeated in the media and by third parties. In either case, Defendant lacks authority under Florida law to designate CAIR as any kind of terrorist organization.

44.  Later that same evening, Defendant again posted on X, sharing his original announcement of the Executive Order and stating, "Members of the FL Legislature are crafting legislation to stop the creep of sharia law, and I hope that they codify these protections for Floridians against CAIR and the Muslim Brotherhood in their legislation."

45.  Defendant has knowledge of, disagrees with, disapproves of, and is hostile to CAIR's and CAIR-Florida's religious views and practices, their pro-Palestinian political advocacy, and their public expression and dissemination of those views through speech, association, and petitioning activity, as reflected in his public statements, policy positions, and actions.

### F.    *Executive Order 25-244*

46.  On December 8, 2025, Defendant issued Executive Order 25-244, titled "Protecting Floridians from Radical Islamic Terrorist Organizations," purporting to exercise executive authority, a copy of which is attached hereto as Exhibit A.

47.  On its face, the Executive Order imposes immediate and self-executing legal consequences, alters Plaintiffs' legal status, and excludes them from

opportunities otherwise available to nonprofit organizations in Florida, without the need for any further instruction or implementing action. After a series of recitals, the Executive Order has three operative sections.

### Section 1 of the Executive Order

48.  Section 1 of the Executive Order unilaterally designates CAIR a "terrorist organization." The Executive Order was issued without notice, opportunity to be heard, or process to challenge Defendant's unilateral designation of CAIR or seek relief from it before or after issuance. The designation alone constitutes a direct ongoing legal disability that inflicts immediate and continuing harm on CAIR.

49.  The Executive Order identifies no criminal charges or convictions against CAIR and relies on no federal designation of CAIR as a Foreign Terrorist Organization or a Specially Designated Global Terrorist. It does not identify any conduct by CAIR that would justify or warrant its designation as a "terrorist organization" nor does it explain how CAIR has been, is now, or is likely to become a threat to the public peace in Florida. Although the Executive Order asserts that its purpose is to preserve the public peace, that assertion is pretextual considering Defendant's public statements, actions, and contemporaneous conduct surrounding the issuance of the Order.

50.     On its face, the Executive Order's designation is not time-bound or limited and remains effective until the Executive Order is rescinded or enjoined, without any periodic review or termination mechanism.

### Section 2 of the Executive Order

51.     Section 2 of the Executive Order prohibits CAIR, solely by virtue of the designation in Section 1, from receiving any contract, employment, funds, or other benefit or privilege from Executive and Cabinet Agencies (other than the Florida Department of Law Enforcement ("FDLE") and the Florida Highway Patrol ("FHP")), from any entity regulated by those agencies, and from any county or municipality. The scope and reach of this prohibition and deprivation is exceptionally broad, encompassing multiple categories of benefits and extending across a wide range of public and private actors.

52.     Section 2 of the Executive Order expansively targets and impairs CAIR's ability and opportunity to operate and engage in constitutionally protected advocacy in furtherance of its mission through exclusion from these benefits, programs, and opportunities.

53.     Section 2 not only prohibits CAIR from receiving any contracts, employment, funds, or other benefits or privileges, but also extends those prohibitions to any person known to have provided "material support or resources" to CAIR, solely by virtue of the designation in Section 1, including CAIR-Florida.

Under Florida law, "material support or resources" is defined to broadly include "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, . . . communications equipment, facilities, . . . personnel, or transportation." Because this definition sweeps in a wide range of ordinary associational and expressive activity, Section 2 effectively subjects third parties to the same exclusions and prohibitions imposed on CAIR, without any temporal limitation, scienter requirement, or privity constraint.

54. This aspect of Section 2 impairs Plaintiffs' ability to operate and engage in constitutionally protected advocacy in furtherance of their missions by coercing and deterring third parties from associating and interacting with Plaintiffs for fear of being subjected to the same exclusions imposed on CAIR. Section 2 also burdens the constitutionally protected rights of those third parties, including their freedom of association, compounding the injury caused by the Executive Order.

55. Under Section 2, FDLE and FHP are directed to take unspecified measures to prevent purportedly unlawful activity by CAIR, a directive that is vague and undefined and that follows directly from the Executive Order's designation of CAIR as a "terrorist organization." By branding CAIR in this manner and directing law enforcement agencies to act on that basis, the Executive Order

signals that CAIR warrants heightened law enforcement scrutiny. This directive singles out CAIR for adverse treatment based on the content and viewpoint of its protected advocacy, creates an objectively reasonable risk of intimidation, retaliatory enforcement, and exclusion from government-administered forums, and thereby chills and impairs Plaintiffs' constitutionally protected speech, association, and petitioning activity.

### Section 3 of the Executive Order

56.   Finally, Section 3 of the Executive Order instructs the Domestic Security Oversight Council ("DSOC") to conduct a comprehensive review of Florida law and policy for addressing threats from designated terrorist organizations, that is, CAIR, and recommend changes to statutory authority, among other things, to the Governor and leaders of the legislature by January 6, 2026, one week before the start of Florida's annual general legislative session, underscoring the Executive Order's forward-looking and continuing effects. The DSOC met for this purpose on December 19, 2025.

### G.   *Defendant's Improper Purpose for Issuing Executive Order 25-244*

57.   In addition to issuing the Executive Order against CAIR based on its disfavored expressive activities and advocacy, Defendant publicly revealed an additional improper purpose through his public statements in response to Plaintiffs' announcement of their intent to challenge the Order in court.

58.    On December 8, 2025, the same day Defendant issued the Executive Order, Plaintiffs announced in a joint statement their intention to file a lawsuit challenging the legality of the Executive Order.

59.    In response, Defendant publicly stated that he welcomed litigation because it would provide an opportunity to obtain CAIR's financial records and internal information through discovery—information he acknowledged would otherwise be unavailable to him.

60.    On the evening of and after Plaintiffs' joint statement, in response to a reporter tagging him in a post on X about Plaintiffs' anticipated lawsuit, Defendant posted, "I look forward to discovery — especially the CAIR finances. Should be illuminating!"

61.    On December 9, 2025, Jeremy Redfern, who is Florida Attorney General James Uthmeier's current Deputy Chief of Staff and Defendant's former press secretary, tagged Defendant in a post on X that linked to a New York Post article concerning a prior lawsuit involving CAIR. In the same post, referring to Plaintiffs' newly announced intention to file suit challenging the Executive Order, Redfern wrote, "Then discovery should be easy for you, right? RIGHT?!?!?" Defendant responded later that day, "Can't wait for CAIR to open the books!"

62.    Also on December 9, 2025, when asked by reporters at an appearance at Florida International University about Plaintiffs' anticipated lawsuit, Defendant again stated that he welcomed the litigation not to defend the legality of the Executive Order, but because it would allow the State to obtain CAIR's financial records through discovery. Defendant repeatedly emphasized that CAIR's finances were, in his view, "really significant," asserted that "a lot of it is financial," and expressed that a lawsuit would enable the State to "get a lot of information" it does not have and otherwise could not obtain. Defendant further justified this position by invoking discredited allegations from unrelated, decades-old litigation and asserting—without any adjudication or charge—that CAIR's finances warranted heightened scrutiny. Defendant stated that he was "definitely not running from" such discovery and affirmatively welcomed the opportunity to "open the books."

63.    Defendant's responses to Plaintiffs' announcement of their intent to challenge the Executive Order's stated purpose of preserving the public peace exposes that justification as pretextual. Rather than defending the legality or necessity of the Executive Order, Defendant publicly welcomed litigation as a means of obtaining CAIR's financial records and internal information through discovery that would otherwise be unavailable to him.

64.    Defendant's public statements and actions instead reveal that the Executive
       Order was issued for retaliatory and improper purposes: to penalize Plaintiffs
       because he disapproves of the content and viewpoint of their religious and
       pro-Palestinian advocacy; to chill and deter constitutionally protected speech,
       association, and petitioning activity; to coerce third parties into suppressing
       Plaintiffs' advocacy by deterring them from associating or cooperating with
       Plaintiffs; to impair the exercise of Plaintiffs' other constitutional rights; and
       to attempt to justify intrusive government surveillance and investigation of
       Plaintiffs that would be otherwise improper and unavailable to the Defendant
       and the State.

### H.    Executive Order 25-244 and Its Realized, Ongoing Harms

65.    In less than 30 days, the Executive Order has already had a direct and imme-
       diate effect of harming CAIR and CAIR-Florida and causing irreparable in-
       jury.

66.    For example, in December 2025, prior to Defendant's issuance of the Execu-
       tive Order, CAIR was in the final stages of launching a new podcast and had
       entered into a proposed production agreement with a Florida-based company.
       The podcast was intended to advance CAIR's public education and civil rights
       mission through speech and expressive activity protected by the First Amend-
       ment.

67.   After issuance of the Executive Order, the production company withdrew from the agreement stating that it was advised against working with CAIR due to Defendant's designation of it as a "terrorist organization" and the objectively reasonable risk that associating with CAIR could subject the company to the Executive Order's prohibitions and deprivations for providing "material support" to a designated organization.

68.   As a result of the Executive Order, CAIR has already suffered the loss of the contract and business relationship with the production company, as well as the loss of the opportunity for speech and advocacy that the podcast would have provided. The production company further indicated that it would reconsider associating with CAIR if the Executive Order were declared unlawful and enjoined.

69.   As another illustration of the concrete and particularized injury caused by the Executive Order, payments owed to CAIR pursuant to an award of attorneys' fees and costs from successful litigation have been suspended in reliance on the Executive Order. Since 2023, Laura Loomer and her media company have been making monthly payments to CAIR to satisfy that award.

70.   On January 5, 2026, counsel for Loomer informed CAIR that because of the Executive Order's designation of CAIR and its material support provision—which define "material support" to include currency and other property—

Loomer and her media company would seek a stay of further payments pending the outcome of CAIR's legal challenge. Counsel further stated that, during the pendency of the stay request, the payments would be placed into the law firm's trust account rather than paid to CAIR. On January 7, 2026, counsel for Loomer filed a motion to stay the payments.[4]

71.   As a result of the Executive Order, CAIR has been deprived of the use of those funds and has been forced to divert staff time and organizational resources to respond to the stay request and to seek recovery of the sequestered payments.

72.   In addition to the injuries already suffered, including the loss of the podcast and the loss of monetary payments, CAIR faces a substantial risk of recurring future harm. Other third parties are likely to respond to the Executive Order's designation and sanctions either by disassociating from CAIR, suspending existing relationships, or refusing to associate in the foreseeable future, including in connection with upcoming events such as next month's Muslim Day at the Florida legislature or Ramadan activities.

73.   The Executive Order's coercive and deterrent effect on third parties is also evident with respect to CAIR-Florida. Shortly after Defendant issued the Executive Order, a CAIR-Florida employee sought to meet with a county government official for the purpose of engaging in constitutionally protected

---

[4] *Illoominate Media, Inc. v. CAIR Florida*, 2019-cv-81179 (S.D. Fla.).

speech and petitioning activity. The county official delayed meeting until he was able to consult with legal counsel because of the Executive Order.

74. As a result of the Executive Order, CAIR-Florida has experienced disruptions to planned advocacy and public-facing activities. CAIR-Florida intends on visiting different Florida mosques throughout Ramadan (because Muslims attend the mosque every night for service) and plans on speaking with members of the mosque about its work including how the members may get more civically engaged. However, CAIR-Florida has not been able to confirm these visits, with at least one mosque declining its request

75. CAIR and CAIR-Florida have also been forced to divert staff time and organizational resources away from their ordinary programming to respond to the Executive Order and to respond to inquiries from the media and partner organizations concerning the Order and its effects. They also face a substantial risk of suffering this harm in the immediate future.

76. CAIR and CAIR-Florida are also imminently threatened with denial of access to the Florida Capitol for the 2026 Muslim Day at the legislature during the first week of February (or any time in the future).

77. There is a substantial risk that the Capitol Police, a division of FDLE, will deny Plaintiffs access to the Capitol based on the Executive Order's designation of CAIR as a "terrorist organization" or based on alleged "material

support" to such an organization from CAIR-Florida. The substantial risk of denial of use of facilities or access is not limited to the Florida Capitol. It also exists with respect to other state, county, and municipal facilities.

78.    Denial of access to the Florida Capitol or its facilities, or other state, county, or municipal facilities, would irreparably harm Plaintiffs by depriving them of their First Amendment rights to speech, association, and petition in a public forum.

## CLAIMS

## COUNT I

## FIRST AMENDMENT VIOLATION

## Deprivation of Right to Free Speech

## (Plaintiffs against Defendant)

79.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 78 as if fully set forth herein.

80.    Plaintiffs bring this claim under the First Amendment to the United States Constitution, applied to the states by the Fourteenth Amendment, and 42 U.S.C. § 1983, for declaratory and prospective injunctive relief.

### *Discrimination Based on Content and Viewpoint*

81.    The First Amendment bars state government officials from punishing organizations for the exercise of First Amendment protected speech.

82.  The First Amendment further prohibits state government officials from discriminating against speech based on its source, content, message, ideas, or viewpoint, particularly where the targeted speech pertains to matters of public concern such as faith and religion, government affairs, public policy, politics, and civil rights.

83.  Plaintiffs' advocacy and speech are viewpoint-specific and pertain to matters of public concern, including faith and religion, government affairs, civil rights, politics, and public policy.

84.  Plaintiffs engaged in protected speech on matters of public concern when they engaged in civil rights advocacy, public education, community organizing, and public commentary on domestic and international issues affecting American Muslims through lawful and peaceful means.

85.  Plaintiffs engaged in protected speech when they advocated for Palestinian human rights; criticized Israeli government policies affecting Palestinian human rights; criticized U.S. government support for those policies; opposed HB 119 and criticized Defendant's endorsement of it; and otherwise engaged in public policy and civil rights advocacy on these matters.

86.  Defendant issued the Executive Order to penalize and discriminate against Plaintiffs for exercising their protected speech because he disapproved of Plaintiffs' viewpoints.

87.  The Executive Order prohibits Plaintiffs from receiving any contract, employ-ment, funds, or other benefit or privilege from any Florida executive agency, any entity regulated by a Florida executive agency, or any Florida county or municipal government, solely by virtue of the designation and because of Plaintiffs' constitutionally protected advocacy.

88.  Defendant's issuance of the Executive Order was motivated by Plaintiffs' ex-ercise of their First Amendment free speech rights and his disagreement with and disfavor of the viewpoints held and expressed by Plaintiffs, as reflected in his public statements and actions.

89.  The absence of any identified, ongoing, or imminent threat to public safety, combined with the Executive Order's immediate, self-executing designation and lack of standards, findings, or procedural safeguards, further demonstrates that the Order's asserted purpose of preserving the public peace is a pretext for content- and viewpoint-based discrimination. In the absence of any emer-gency or neutral justification requiring immediate action, Defendant's deci-sion to single out Plaintiffs' protected religious and pro-Palestinian advocacy through a sweeping and punitive classification supports a reasonable inference that the Executive Order was issued because of disagreement with Plaintiffs' viewpoints and expression of them, rather than to serve any legitimate gov-ernmental interest.

90.    Viewpoint-based discrimination is *per se* unconstitutional.

91.    There is no legitimate, let alone compelling, governmental interest justifying the infringement of Plaintiffs' First Amendment rights. Even if a legitimate interest existed, the Executive Order would violate the First Amendment because it is not narrowly tailored and burdens substantially more speech than necessary to further any purported governmental interest.

### Retaliation for Protected Speech

92.    The First Amendment bars state government officials from punishing or retaliating against people or organizations for engaging in protected speech on matters of public concern.

93.    Plaintiffs engaged in core constitutionally protected speech through advocacy, public education, community organizing, and public commentary on matters of public concern such as civil rights, public policy, and domestic and international issues affecting American Muslims.

94.    Plaintiffs engaged in protected speech when they advocated for Palestinian human rights; criticized Israeli government policies affecting Palestinian human rights; criticized the U.S. government and Defendant's support for those policies; opposed HB 119 and sharply criticized Defendant's endorsement of it; and otherwise engaged in public policy and civil rights advocacy on these matters.

95.   Plaintiffs also engaged in protected activity by suing Defendant on behalf of university students who exercised protected speech on these same topics after Defendant sought to ban those students from public universities in Florida based on their viewpoints.

96.   Defendant was motivated by Plaintiffs' exercise of core protected speech and retaliated against Plaintiffs by issuing the Executive Order because he disapproved of the viewpoints they expressed. Defendant lacked any legitimate, let alone sufficient, non-retaliatory justification for issuing the Executive Order.

97.   The Executive Order imposes government-mandated stigma and alters Plaintiffs' legal status by branding CAIR as a "terrorist organization," prohibits Plaintiffs from receiving any contract, employment, funds, or other benefit or privilege from Florida executive agencies, entities regulated by those agencies, or Florida county or municipal governments, and establishes a coercive framework that creates an objectively reasonable risk of adverse government action against those who associate with Plaintiffs.

98.   Defendant's retaliatory issuance of the Executive Order, with its stigmatizing designation and its sweeping consequences, would likely deter a person of ordinary firmness from engaging in such protected speech in the future.

99.   In addition to disapproving of Plaintiffs' protected advocacy, Defendant issued the Executive Order in response to Plaintiffs' announced opposition to

HB 119 and condemnation of Defendant's endorsement of it, as well as Plaintiffs' religiously grounded advocacy concerning Islam and sharia law. Defendant's issuance of the Executive Order was intended to punish and suppress Plaintiffs' exercise of their constitutional rights in advance of the 2026 legislative session, during which legislation targeting "creeping sharia" and CAIR was expected to be considered.

***Coercion of Third Parties to Punish or Suppress Free Speech***

100. The First Amendment also prohibits state officials from coercing private third parties to punish or suppress speech on the State's behalf by threatening or imposing legal sanctions, denying government benefits, or taking other adverse actions to achieve indirectly what the State may not do directly.

101. To pursue its faith-based mission through core constitutionally protected speech—including public education, interfaith work, and civil rights and policy advocacy—CAIR must interact, associate, transact, and coordinate with third parties such as members of the public, other organizations, businesses, and its affiliates, including CAIR-Florida, as an essential predicate to that speech.

102. The Executive Order prohibits third parties, whether individuals or businesses, who provide "material support or resources" to CAIR from receiving any contract, employment, funds, or other benefit or privilege from Florida

executive agencies, entities regulated by those agencies, or Florida county or municipal governments, solely by virtue of providing such support.

103. The Executive Order is coercive and reasonably understood to convey the threat of adverse government action against any third party who provides material support, defined broadly to include property, personnel, or services, to CAIR, even in the absence of any unlawful conduct by those third parties.

104. The Executive Order's prohibition on benefits to third parties that provide material support to CAIR can reasonably be understood as a threat not to cooperate, interact, associate, or coordinate with CAIR, thereby punishing and suppressing CAIR's disfavored speech on Defendant's behalf.

105. Defendant included the material support provision targeting third parties for the purpose of punishing and suppressing CAIR's speech and advocacy of which he disapproved, as reflected in his public statements and actions in response to Plaintiffs' protected expression. The inclusion of this provision— which is not meaningfully limited, narrowly tailored, or necessary to advance the Executive Order's stated purpose—further demonstrates its improper purpose.

106. Plaintiffs have been harmed and continue to suffer irreparable harm from the Executive Order's violation of Plaintiffs' First Amendment right to free

speech, including the exposure of protected speech to a credible threat of state-imposed penalties.

## COUNT II

## FIRST AMENDMENT VIOLATION

### Deprivation of Right to Petition

### (Plaintiffs against Defendant)

107. Plaintiffs reallege and incorporate by reference paragraphs 1 through 78 as if fully set forth herein.

108. Plaintiffs bring this claim under the First Amendment to the United States Constitution, applied to the states by the Fourteenth Amendment, and 42 U.S.C. § 1983, for declaratory and prospective injunctive relief.

109. The First Amendment protects the right of the people to petition the government for a redress of grievances.

110. The First Amendment bars state government officials from retaliating against individuals or organizations for exercising their right to petition the government for redress of grievances. The right to petition extends to all branches of the government.

111. Plaintiffs engaged in the constitutionally protected right to petition when they represented Students for Justice in Palestine in its lawsuit against Defendant in *Students for Justice in Palestine at the University of South Florida v.*

*DeSantis*, No. 1:23-cv-00281 (N.D. Fla.), seeking judicial relief from state action.

112.    Plaintiffs engaged in the constitutionally protected right to petition through advocacy directed at government officials, including issuing a joint press release opposing HB 119 and Defendant's endorsement of it; submitting advocacy letters to state and federal agencies concerning Islamophobia and Palestinian human rights; and engaging in advocacy before the U.S. Congress, the Florida legislature, and county and municipal governments seeking changes to government policy and practice.

113.    Defendant retaliated against Plaintiffs for exercising their right to petition the government by issuing the Executive Order. The Executive Order prevents Plaintiffs, and those who support or provide material support to Plaintiffs, from receiving contracts, employment, funds, or other benefits or privileges from any Florida executive agencies, entities regulated by those agencies, and Florida county or municipal governments. By doing so, the Executive Order substantially burdens and impairs Plaintiffs' right to petition the legislature, state executive agencies, cities and counties, and the courts by limiting or denying access to government officials, governmental forums, facilities, and buildings, and association with third parties necessary to effective petitioning,

and by creating an objectively reasonable risk of deterrence from engaging in such activity.

114. Defendant's retaliatory issuance of the Executive Order would deter a person of ordinary firmness from petitioning the government or engaging in these protected activities again.

115. Defendant's issuance of the Executive Order was motivated by Plaintiffs' exercise of their constitutionally protected right to petition the government because he disapproved of the views and public policy positions Plaintiffs advanced through petitioning activity, as well as the views of individuals and organizations Plaintiffs represented before the courts, as reflected in Defendant's public statements and actions.

116. Plaintiffs have been harmed and continue to suffer irreparable harm from the Executive Order's violation of their First Amendment right to petition, including by subjecting their petitioning activity to a credible threat of state-imposed penalties.

## COUNT III

## FIRST AMENDMENT VIOLATION

### Deprivation of Right to Association

### (Plaintiffs against Defendant)

117.  Plaintiffs reallege and incorporate by reference paragraphs 1 through 78 as if fully set forth herein.

118.  Plaintiffs bring this claim under the First Amendment to the United States Constitution, applied to the states by the Fourteenth Amendment, and 42 U.S.C. § 1983, for declaratory and prospective injunctive relief.

119.  The First Amendment guarantees freedom of association as an indispensable means of preserving other individual liberties. The right to associate for the purpose of engaging in activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion— is referred to as expressive association and receives heightened constitutional protection.

120.  In pursuing their faith-based mission, Plaintiffs' protected advocacy necessarily involves association, interaction, and coordination with each other, members of the public, and other organizations and businesses as an essential predicate to public education, interfaith work, and legal, civil rights and public policy advocacy. By branding Plaintiffs as "a terrorist organization" and treating association with them as "material support," the Executive Order infringes Plaintiffs' freedom of association by substantially limiting, and creating a significant risk of denying, their ability to engage in expressive association and advocacy.

121.  Plaintiffs engage in the protected right to associate to carry out their faith-based mission by educating, advocating, empowering, organizing, and defending American Muslims in Florida and nationwide. This includes, among other activities, civic engagement presentations at Florida mosques, Muslim Day at the U.S. and Florida Capitols, and legal advocacy in the courts as part of their expressive association.

122.  Plaintiffs regularly engage in the protected expressive association during Ramadan through outreach to Muslim communities across Florida. Furthermore, they associate with other organizations in their defense of Palestinian human rights, such as with Students for Justice in Palestine. They also engage in coalitions with others as they did in their efforts to secure the release of Mohammed Ibrahim and bring him back to the United States and to advocate for or against local, state, and federal legislative proposals and executive agency rules, policies, and procedures.

123.  The Executive Order penalizes and impairs Plaintiffs' freedom of association by prohibiting Plaintiffs—and those who associate with or provide "material support or resources" to Plaintiffs—from receiving contracts, employment, funds, or other benefits or privileges from Florida executive agencies, regulated entities, any county or municipal governments, solely by virtue of that association. The Executive Order's extraordinarily broad definition of

"material support," combined with the absence of temporal, scienter, or privity limitations, causes third parties to reasonably fear that ordinary associational activity may expose them to adverse government action, thereby deterring association or forcing disassociation from Plaintiffs.

124. The Executive Order also infringes the freedom of association of third parties by establishing a coercive framework in which association with Plaintiffs is itself burdened through the threat of adverse government action, including exposure to the Executive Order's material support provisions and exclusion from receiving government benefits. Even apart from formal sanctions, the designation itself deters third parties from exercising their own associational rights due to the stigma and reputational harm associated with guilt by association.

125. The Executive Order was issued in direct response to Plaintiffs' expression of views Defendant opposes and Plaintiffs' association with persons and groups he has public disapproved of and targeted, including Students for Justice in Palestine, as reflected in his public statements and actions.

126. Plaintiffs have been harmed and continue to suffer irreparable harm from the Executive Order's violation of their constitutionally protected freedom of association because it conditions access to government benefits and participation in public life on disassociation from Plaintiffs and deters third parties

from associating with them, thereby imposing an ongoing and coercive burden on protected expressive association.

## COUNT IV

## FOURTEENTH AMENDMENT VIOLATION

### Violation of Right to Procedural Due Process

### (Plaintiffs against Defendant)

127. Plaintiffs reallege and incorporate by reference paragraphs 1 through 78 as if fully set forth herein.

128. Plaintiffs bring this claim under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, for declaratory and prospective injunctive relief.

129. The Fourteenth Amendment Due Process Clause prohibits state officials from depriving individuals or organizations of liberty or property interests without notice and an opportunity to be heard. This protection applies when the government imposes legal classifications, burdens, or consequences that affect an individual's or organization's ability to operate, associate, or participate in public life. The Due Process Clause is violated when the government imposes a binding classification that alters rights or eligibility through self-executing state action without procedural safeguards.

130. Defendant issued the Executive Order without notice of any kind to Plaintiffs.

131. The Executive Order was self-executing and immediately effective upon issuance. It contains no standards, criteria, evidentiary process, opportunity to respond, or mechanism for review or removal of the designation, either before or after issuance.

132. Plaintiffs were provided with no procedural safeguards prior to being designated as a "terrorist organization" by the Executive Order and subjected to deprivations of protected liberty and property interests that alter their legal status and eligibility to participate in public programs and to receive contracts, employment, funds, or other benefits and privileges from a wide range of state and local governmental entities and regulated third parties. The right to be heard before being condemned to suffer grievous loss is a principle basic to our society.

133. The Executive Order was not issued in response to any identified, ongoing, or imminent emergency or threat to public safety. The absence of any such emergency, combined with the lack of findings or procedural safeguards, renders the Executive Order's asserted purpose of preserving the public peace unsupported and insufficient to justify the deprivation of due process protections.

134. Florida law provides no statutory authority or procedural framework permitting Defendant to designate a domestic nonprofit organization as a "terrorist organization," nor does it set forth any process for evaluating, challenging, or

reviewing such a designation, before or after it is made. The Executive Order therefore imposes a state-driven classification with binding legal consequences without any legislative authorization or procedural due process protection.

135. By issuing the Executive Order, Defendant violated Plaintiffs' Fourteenth Amendment right to due process by depriving them of protected interests and causing them to suffer grievous loss without notice or an opportunity to be heard.

136. Plaintiffs have been harmed and continue to suffer irreparable harm from the Executive Order's violation of their Fourteenth Amendment right to procedural due process, including through the imposition of a binding legal classification and legal consequences without procedural safeguards. State court remedies would be inadequate to address the harms Plaintiffs have suffered.

## PRAYER

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and grant the following relief:

A. A declaration pursuant to 28 U.S.C. § 2201 that Executive Order 25-244, on its face and as applied to Plaintiffs, is unlawful, unconstitutional, void, and of no force or effect.

B. A preliminary injunction prohibiting Defendant, his agents, and all persons acting in concert or participating with him from enforcing, implementing, publishing, publicizing, relying on, or otherwise giving effect to Executive Order 25-244 as it relates to Plaintiffs pending final judgment, including by ordering Defendant to strike CAIR from Executive Order 25-244 for the duration of the injunction.

C. A permanent injunction prohibiting Defendant, his agents, and all persons acting in concert or participating with him from enforcing, implementing, publishing publicizing, relying on, or otherwise giving effect to Executive Order 25-244 as it relates to Plaintiffs, including by ordering Defendant to strike CAIR from Executive Order 25-244 in all respects.

D. An order directing Defendant, his agents, and all persons acting in concert or participating with him to take all necessary steps to effectuate this Court's judgment, including by:

    i.   Directing the Florida Department of Law Enforcement, the Florida Highway Patrol, Florida Executive and Cabinet Agencies, all entities regulated by Florida Executive or Cabinet Agencies, and Florida counties and municipalities to disregard and not give effect to Executive Order 25-244 as it relates to Plaintiffs;

ii.   Removing all state-administered classifications, labels, designa-
tions, or listings created or imposed by, pursuant to, or based on Ex-
ecutive Order 25-244, that explicitly state or imply that CAIR or
CAIR-Florida is a "terrorist organization," from all state publica-
tions, databases, websites, and public-facing materials;

iii.   Providing notice to relevant state agencies, departments, political
subdivisions, and state regulated entities that Executive Order 25-
244 has been declared unlawful, unconstitutional, void *ab initio*, and
of no force or effect and has been permanently enjoined;

iv.   Requiring Defendant to issue a corrective notice to relevant state
agencies and to the public clarifying that Plaintiffs are not and have
never been lawfully designated as a terrorist organization under
Florida law, and that any prior statements or publications to the con-
trary were unlawful and without legal effect; and

v.   Prohibiting Defendant, his agents, and all persons acting in concert
or participation with him from reissuing, re-adopting, or enforcing
any executive order, directive, policy, or practice that has the pur-
pose or effect of designating Plaintiffs as a "terrorist organization"
or otherwise imposing substantially similar classifications, sanc-
tions, or disabilities based on the same conduct or expressive

activity that underlies Executive Order 25-244, absent constitution-

ally sufficient statutory authority and procedural safeguards.

E.  An award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988

and any other applicable law.

F.  Such other and further relief as the Court deems just, proper, and consistent

with the Constitution and laws of the United States and the State of Florida,

excluding any award of monetary damages.

Respectfully submitted this 16th day of January, 2026.

/s/ Scott D. McCoy
Scott D. McCoy
    FL Bar No. 1004965
    scott.mccoy@splcenter.org
    (786) 347-2056
SOUTHERN POVERTY LAW CENTER
    2 S. Biscayne Blvd., Ste. 3200
    Miami, FL 33131

Arthur Ago
    DC Bar No. 463681
    Admitted *pro hac vice*
    (202) 961-9325
    arthur.ago@splcenter.org
SOUTHERN POVERTY LAW CENTER
    1101 17th St. NW, Ste. 550
    Washington, DC 20036
    (202) 971-9205 (fax)

Ahmed K. Soussi
    LA Bar No. 38414
    Admitted *pro hac vice*
    ahmed.soussi@splcenter.org
    (334) 213-8303

Huey Fischer García
    LA Bar No. 39571
    Admitted *pro hac vice*
    huey.fischergarcia@splcenter.org
    (504) 884-7680
SOUTHERN POVERTY LAW CENTER
    400 Washington Ave.
    Montgomery, AL 36104

Omar Saleh
    FL Bar No. 91216
    (833) 224-7352
    osaleh@cair.com
CAIR-FLORIDA
    8076 N. 56th St.
    Tampa, FL 33617

Lena F. Masri
    DC Bar No. 1000019
    Admitted *pro hac vice*
    lmasri@cair.com
Gadeir I. Abbas
    VA Bar No. 81161; not licensed in DC
    Admitted *pro hac vice*
    gabbas@cair.com
CAIR LEGAL DEFENSE FUND
    453 New Jersey Ave. SE
    Washington, DC 20003
    (202) 742-6420
    ldf@cair.com

Charles D. Swift
    TX Bar No. 24091964
    *Pro hac vice* motion forthcoming
    cswift@clcma.org
MUSLIM LEGAL FUND OF AMERICA
    100 N. Central Expy., Ste. 1010
    Richardson, TX 75080
    (972) 914-2507

Shereef H. Akeel
    MI Bar No. P54345
    Admitted *pro hac vice*
    shereef@akeelvalentine.com
Samuel Simkins
    MI Bar No. 81210
    Admitted *pro hac vice*
    sam@akeelvalentine.com
AKEEL & VALENTINE, PLC
    888 W. Big Beaver Rd., Ste. 350
    Troy, MI 48084
    (248) 269-9595

*Counsel for Plaintiffs*