# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

CAIR-FOUNDATION, INC. and CAIR-FLORIDA, INC.,

    *Plaintiffs,*

  v.

RONALD DESANTIS, in his official capacity as Governor, State of Florida,

    *Defendant.*

Case No. 4:25-cv-516-MW-MJF

# DEFENDANT'S RESPONSE
# TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

JAMES UTHMEIER
 *Attorney General*

JEFFREY PAUL DESOUSA (FBN 110951)
 *Acting Solicitor General*
JASON J. MUEHLHOFF
 *Chief Deputy Solicitor General*
SAMUEL F. ELLIOTT (FBN 1039898)
 *Deputy Solicitor General*
TYLER E. GUSTAFSON (FBN 1049292)
 *Assistant Solicitor General*
CASEY J. WITTE (FBN 1070288)
 *Solicitor General Fellow*
JAMES WACZEWSKI (FBN 0154989)
 *Special Counsel*
OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, Florida 32399
(850) 414-3300
*jeffrey.desousa@myfloridalegal.com*
*jenna.hodges@myfloridalegal.com*

*Counsel for Governor DeSantis*

1

# TABLE OF CONTENTS

Introduction ................................................................................................ 3

Statement of Facts ...................................................................................... 4

    A.    CAIR's founding, organizational structure, and history of terrorism. ................................................................................ 4

    B.    The Governor's Executive Order. ........................................... 11

    C.    CAIR sues the Governor. .......................................................... 12

Legal Standard ......................................................................................... 12

Argument .................................................................................................. 13

I.    CAIR lacks standing for preliminary-injunction relief. ....................... 13

II.    CAIR has not met the preliminary-injunction factors ......................... 19

    A.    CAIR is unlikely to succeed on the merits of its First Amendment claims. ................................................................. 19

        1.    CAIR's free-speech claims are unlikely to succeed. ...... 20

            i.    The Executive Order is not a regulation of speech, but if it were, it is viewpoint neutral, content neutral, and otherwise valid. ................... 20

            ii.    CAIR's alleged retaliation claim is deficient. ...... 25

            iii.    The coercion claim fails as a matter of law. ........ 32

        2.    CAIR's association claim is unlikely to succeed. ........... 35

        3.    CAIR's petition claim is unlikely to succeed. ................. 36

    B.    CAIR's claims of irreparable injury are weak and undermined by delay. ............................................................... 36

    C.    The public interest and balance of the equities disfavor preliminary relief. .................................................................... 37

Conclusion ................................................................................................ 38

Certificate of Service ............................................................................... 39

## INTRODUCTION

Substantial evidence—none of which CAIR-Foundation, Inc. (CAIR) disputes—shows that CAIR has close links to radical terrorist organizations. Indeed, CAIR began as a "cover" for Hamas, was an unindicted co-conspirator in the Holy Land Foundation prosecution, and for decades has seen its board members and other representatives repeatedly tied to terrorism. Through Executive Order 25-244 (EO), Governor DeSantis identified CAIR itself as a terrorist organization and instructed Florida state agencies not to contract with or bestow government benefits on the organization. That decision by the state executive on matters of state security is entitled to deference.

CAIR's request for a preliminary injunction should be denied. At this stage, CAIR has failed to demonstrate that it has standing to secure such a drastic remedy. Rather, CAIR's alleged harms are both speculative and based on third-party conduct. It is therefore no surprise that its alleged harms have not materialized. As an example, while it claims to be barred from Florida government buildings, it recently participated in events at the Florida Capitol.

On the merits, CAIR's claims also falter. It has not shown that the EO is a viewpoint-based restriction of speech; in fact, the EO is not a speech regulation at all, and instead singles CAIR out for the organization's past *conduct*—CAIR's support of terrorism. Likewise, CAIR's First Amendment retaliation claim is not viable. CAIR cannot show that the Governor targeted CAIR because it holds views that the Governor does not like. All the evidence is to the contrary: that the Governor issued the EO because

3

CAIR has longstanding links to terrorism, which (again) CAIR does not dispute. Finally, its coercion claim ignores that the EO has nothing to do with speech and that, at any rate, the government can prohibit material support for terrorism under any tier of scrutiny.

As for CAIR's non-speech claims, the EO does not deprive CAIR of the First Amendment right of association. Third parties are free to associate with CAIR; they simply cannot provide material support for terrorism. Courts across the country have rejected materially identical theories. And CAIR's novel right-to-petition claim is undermined by its conduct since filing this lawsuit and by the fact that the EO does nothing to prevent CAIR from seeking a redress of grievances.

Finally, CAIR has shown neither that it is irreparably harmed by the EO—after all, it delayed a month and a half before seeking preliminary relief in this Court—or that the equities favor injunctive relief.

## STATEMENT OF FACTS

### A.    CAIR's founding, organizational structure, and history of terrorism.

The Council on American-Islamic Relations (CAIR) purports to be "America's largest Muslim civil rights and advocacy organization." Am. Compl., Dkt. 21, ¶ 7. Yet its founding, organizational structure, and history reflect its longstanding ties to terrorism and terror organizations.

CAIR was created by terror elements including the Muslim Brotherhood and Hamas. Those connections remain. The Muslim Brotherhood is a radical transnational

Islamist organization that seeks to impose Islamic, or "Sharia," law through violent means, including terrorism.[1] In the late 1980s, Muslim Brotherhood members founded Hamas, which, as its founding charter states, "is one of the wings of M[usli]m Brotherhood."[2]

Hamas, guided by "Islamic fundamentalism," seeks to destroy the state of Isreal and establish an "Islamic state" in its place through violence.[3] Hamas has a long history of violent terrorism. True to form, it heinously attacked Israel on October 7, 2023, killing 1,200 people (including 46 Americans) and taking more than 250 hostages.[4]

The Muslim Brotherhood quickly created a robust support apparatus for Hamas across the globe, including within the United States.[5] Between the late 1980s and early 1990s, Musa Abu Marzook, a Hamas Politburo leader, established several entities under the "Palestine Committee of the Muslim Brotherhood" umbrella.[6] These organizations

---

[1] *See The Muslim Brotherhood's Global Threat, H. Oversight and Gov. Reform Subcomm. on Nat'l Sec.*, 115th Cong. 5–7 (2018) (statement of Dr. Hillel Fradkin, Senior Fellow, Hudson Institute), https://perma.cc/ERW8-GP9E;

[2] The Covenant of the Islamic Resistance Movement (August 18, 1988), https://perma.cc/9Y27-Z6QN.

[3] Jim Zanotti, Cong. Rsch. Serv. IF12549, Hamas: Background, Current Status, and U.S. Policy 1 (2024).

[4] *Id.*; *see also* Jim Zanotti & Jeremy M. Sharp, R47828, Israel and Hamas Conflict In Brief: Overview, U.S. Policy, and Options for Congress 3 (2024).

[5] Lorenzo Vidino, *The Muslim Brotherhood in America: A Brief History* 19 (July 2025), https://perma.cc/E2C2-7D6B.

[6] *Id.*

included the Holy Land Foundation (HLF) and Islamic Association for Palestine (IAP).[7] As early as 1991, the Palestine Committee planned to create one more organization focused on "political work" that would have its "headquarters" in "Washington [D.C.]."[8]

After the Oslo Accords were signed in August 1993, the Palestine Committee became concerned that Hamas would soon be the target of actions by the United States.[9] So the Palestine Committee convened in Philadelphia.[10] The attendees agreed that, to continue operating in the United States, they should create a "an official U.S. cover representing the Islamic community" that would also serve as a "cover for the [HLF and IAP] in case they got dissolved."[11] FBI officials who had wiretapped the meeting noted the attendance of, among others, two IAP officials, Omar Ahmad and Nihad Awad.[12] Ahmad drove much of the meeting's conversation and Awad gave "a presentation on [] media strategy."[13]

Mere months after the Philadelphia meeting, Ahmad and Awad founded CAIR in Washington D.C. and staffed the new organization with individuals from the

---

[7] *Id.*

[8] *Id.* at 25.

[9] *Id.* at 20.

[10] *Id.*

[11] *Id.* at 24–25.

[12] *Id.* at 20.

[13] *Id.* at 23.

Philadelphia meeting.[14] One attendee affiliated with HLF became the head of one of CAIR's first chapters.[15] In fact, much of CAIR's founding was closely intertwined with these other groups. So much so that Ahmad and Awad performed the early fundraising and organizing for CAIR while both were still at IAP.[16] Ultimately, Ahmad would serve as CAIR's Board Chairman until 2005 and then as a member of the Board for several years thereafter.[17] Awad still serves as CAIR's Executive Director.[18]

By 1994, Palestine Committee records identified CAIR, along with HLF and IAP, as parts of the Palestine Committee.[19] One Palestine Committee meeting agenda suggested that CAIR would be responsible for future "[c]oordination" among those groups.[20] The minutes from that meeting reaffirm the Palestine Committee's commitment to the "Mother Group" — the Muslim Brotherhood.[21]

---

[14] *Id.* at 25–26.

[15] *Id.*

[16] Nihad Awad, *Muslim-Americans in Mainstream America*, The Link (Feb.–March 2000) ("Omar suggested to me that we leave the IAP . . . . He proposed that I move to Washington, D.C., where any effective national effort would have to be based, while he tried to raise the seed money for the project."), https://perma.cc/N8SJ-AC9D.

[17] *CAIR Board Elects New Chairman*, CAIR, May 18, 2005, https://perma.cc/VS22-H88E; *see also* Gerstein *infra* n.58.

[18] Nihad Awad, National Executive Director, CAIR (last accessed Feb. 11, 2026), https://perma.cc/9VPA-44YX.

[19] Vidino, *supra* n.5, at 26.

[20] Lara Burns, et al., *CAIR—Why History is Important* 4 (2025), https://perma.cc/VB73-LKBE.

[21] *Id.* at 5.

Numerous terrorist designations, investigations, and convictions have swirled around CAIR since its founding in 1994. In 1995, President Clinton signed EO 12947, formally designating Hamas a terrorist organization.[22] That same year, the U.S. Treasury designated Palestine Committee organizer Mousa Mohamed Abou Marzook a Specially Designated Terrorist.[23] In 2001, the U.S. Treasury added HLF as a terrorist organization.[24] And in 2004, IAP was held liable for a murder committed by two Hamas terrorists because it had fundraised, published propaganda, and organized travel to the United States for Hamas.[25] Much of IAP's material support for Hamas occurred while Ahmad and Awad were leading IAP.[26]

CAIR itself faced similar troubles. In 1999, Omar Ahmad, then serving as CAIR's chairman, was caught on a wiretap directing an HLF employee and organizing payments for an individual convicted of fundraising for Hamas in the United States.[27]

---

[22] Exec. Order No. 12947, 60 Fed. Reg. 5079 (Jan. 25, 1995), https://perma.cc/6QJ9-JXMZ. The United States also designated Hamas as a Foreign Terrorist Organization in 1997. U.S. Dept. of State, Foreign Terrorist Organizations (last accessed Feb. 11, 2026), https://perma.cc/ZNH2-S7BD.

[23] Press Release, Shutting Down the Terrorist Financial Network, U.S. Dep't of the Treasury, Dec. 4, 2001, https://perma.cc/SVF9-PCPK.

[24] *Id.*

[25] *See Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 688 (7th Cir. 2008) (en banc) (noting that the IAP is an "alter ego" of the American Muslim Society and affirming judgment of liability against the IAP).

[26] *See id.* at 907–911 (citing deposition testimony from Omar Ahmad).

[27] *See United States v. El-Mezain*, 664 F.3d 467, 530–31 (5th Cir. 2011), *as revised* (Dec. 27, 2011) (describing Ahmad's wiretapped statements).

In the late 2000s, litigation revealed that CAIR, alongside the IAP and HLF, was a key player in "the largest terrorism financing case in U.S. history."[28] At trial, "FBI Special Agent Lara Burns labeled the Council on American-Islamic Relations a front group for Hamas."[29] The U.S. Department of Justice went so far as to list CAIR and IAP as unindicted co-conspirators in the HLF prosecution.[30] And the court rejected CAIR's challenge to that designation, concluding there was "ample evidence to establish the associations of CAIR, [HLF, and IAP] . . . with Hamas,"[31] including a check from HLF to CAIR for "consulting services."[32] Prosecutors successfully proved that HLF and its co-conspirators had funneled "approximately $12.4 million" to Hamas.[33]

Governor DeSantis is not the first to limit government involvement with CAIR. In 2008, the FBI banned all "non-investigative outreach with CAIR . . . to ensure that the FBI is not supporting individuals who support extremist or terrorist ideologies."[34]

---

[28] Jason Trahan, *Witness links charity, jihad: Holy Land prosecution expert's credibility questioned by defense*, Dallas Morning News, July 26, 2007, 2007 WLNR 14329176.

[29] Jason Trahan, *Judge due to rule on Holy Land defense challenge*, Dallas Morning News, Oct. 14, 2008, 2008 WLNR 19527769.

[30] *United States v. Holy Land Found. for Relief & Dev.*, No. 3:04-CR-0240-P, 2009 WL 10680203, at *7 (N.D. Tex. July 1, 2009), *aff'd in relevant part*, 624 F.3d 685 (5th Cir. 2010).

[31] *Id.*

[32] Vidino, *supra* n.5, at 26.

[33] Press Release, Federal Judge Hands Downs Sentences in Holy Land Foundation Case, U.S. Dep't of Just., May 27, 2009, https://perma.cc/6HAN-GPB2.

[34] Vidino, *supra* n.5, at 26; *see also* Dep't of Just., Review of FBI Interactions with the Council on American-Islamic Relations 1 (2013), https://perma.cc/2EHW-H8EF.

And in 2014, the United Arab Emirates designated CAIR a terrorist organization.[35] In 2025, the State of Texas followed suit.[36]

In addition to these organizational charges and designations, many CAIR officials, employees, and affiliates have been arrested for, deported for, or convicted of terror-related activities:

- Rabih Haddad, a CAIR-Ann Arbor fundraiser, was deported in 2002. His organization, the Global Relief Foundation, was designated as a front for al-Qaeda by the U.S. Treasury.[37]

- Bassem Khafagi, a CAIR Community-Affairs Director, pled guilty in 2003 to bank and visa fraud, funneling money to a group supporting suicide attacks.[38]

- Randall "Ismail" Royer, a CAIR Communications Specialist, pled guilty in 2004 to weapons and explosives charges that involved assistance he provided to the Taliban.[39]

- Abdurahman Alamoudi, a CAIR affiliate, was sentenced in 2004 for a Libyan-funded plot to assassinate the Saudi crown prince.[40]

---

[35] *UAE Includes 2 US Muslim Groups on Terror List*, Voice of America (Nov. 17, 2014), https://perma.cc/3KBX-J94Y.

[36] Proclamation, Governor Greg Abbott (Nov. 18, 2025), https://perma.cc/W3E3-P88F.

[37] Disassociation from Council on American-Islamic Relations, H.R. 1209, 2024 Sess. at *4 (2024), https://perma.cc/FZ9E-X2DT.

[38] *Id.* at 3–4.

[39] *Id.* at 3.

[40] *Id.*

- Ghassan Elashi, the founder of CAIR-Texas, was convicted in 2008 of providing material support to Hamas via the Holy Land Foundation.[41]

- Mohammad El-Mezain, CAIR's Endowments Chairman, was convicted in 2008 of conspiracy to provide material support to Hamas.[42]

- Muthanna al-Hanooti, Executive Director of CAIR-Michigan, was sentenced in 2011 for violating U.S. sanctions against Iraq by coordinating with the Saddam Hussein regime.[43]

### B.    The Governor's Executive Order.

Considering this wealth of incriminating evidence, the Governor signed Executive Order 25-244 on December 8, 2025. Executive Order, Dkt. 24-4 (EO). The EO contains numerous factual findings and designates several organizations as terrorist organizations. *See* EO 1–3. These include entities the United States has designated as a Foreign Terrorist Organization, as well as the Muslim Brotherhood and CAIR. *See id.* at 3. The EO then instructs select law enforcement agencies to undertake "all lawful measures to prevent unlawful activities in Florida" by these organizations. *Id.* It also requires all executive and cabinet agencies to "undertake all lawful action" to prevent the designated terrorist groups, or any person known to have provided material support "from receiving any contract, employment, funds, or other benefit or privilege" from those agencies. *Id.* at 3–4.

---

[41] *Id.*; *see also supra* n.33.

[42] *El-Mezain*, 664 F.3d at 485; *see also supra* n.33.

[43] *Supra* n.37, at 4.

### C.   CAIR sues the Governor.

CAIR filed its initial complaint on December 15, 2025, yet it did not serve the Governor or move for injunctive relief at that time. It was not until January 16, 2026 that CAIR filed its amended complaint alleging viewpoint discrimination, retaliation, coercion, petition, and association claims under the First Amendment, as well as a due process claim under the Fourteenth Amendment.

CAIR did not serve the Governor until January 20, 2026 and waited until January 23, 2026 to move for preliminary injunctive relief on its First Amendment claims. CAIR seeks a preliminary injunction enjoining the Governor from enforcing the EO, as well as an order compelling the Governor to "strike CAIR from the Executive Order." Dkt. 24 (PI Mot.) 4.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, plaintiffs must show each of the following: (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable injury absent the injunction; (3) their threatened injury outweighs the harm the injunction may cause to Defendants; and (4) the injunction is in the public interest. *Swain v. Junior*, 961 F.3d 1276, 1284–85 (11th Cir. 2020).

**ARGUMENT**

## I.    CAIR lacks standing for preliminary-injunction relief.

As a threshold matter, CAIR cannot demonstrate standing. To prove standing, CAIR must show that it "has suffered, or will suffer, an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quotation omitted). The Court "must first satisfy itself that Plaintiff is substantially likely to establish standing" to seek a preliminary injunction. *Students for Justice in Palestine at the Univ. of S. Fla. v. DeSantis*, 2024 WL 371875, at *1 (N.D. Fla. Jan. 31, 2024) (*SJP I*).

For a preliminary injunction, standing is evaluated "under the heightened standard for evaluating a motion for summary judgment." *Id.* at *2 (citation omitted).[44] The court need not accept the Plaintiff's allegations as true or accept all reasonably drawn inferences in the Plaintiff's favor. *Id.*

CAIR cannot meet this threshold. CAIR's alleged injuries are "one-step-removed, anticipatory" injuries largely stemming from third parties that are not before the court. *See Murthy*, 603 U.S. at 57. Yet CAIR "must face a real and immediate threat of repeated injury" to warrant prospective injunctive relief. *Id.* at 58 (quotation omitted). And any threat of imminent harm is unlikely where there is only a "sequence of uncertain contingencies" "involving multiple independent actors," that must occur before a

---

[44] *See also Students for Justice in Palestine at University of Florida v. Rodrigues*, 2024 WL 374543, at *2 (N.D. Fla. Jan. 31, 2024) (*SJP II*).

harm is realized. *Dream Defenders v. Gov. of the State of Fla.*, 57 F.4th 879, 888 (11th Cir. 2023).

CAIR's motion suffers these defects. It alleges a number of past and future harms that it claims establishes standing: (1) the loss of a podcasting contract with an unnamed third party; (2) the loss of attorneys' fees from an unrelated case and the costs of litigating that motion; (3) denial of access to the Florida Capitol; (4) lost opportunity of a possible future government contract or benefit; and (5) fewer partnerships with mosques for civic events. PI Mot. 10–14. Each alleged injury fails.

    **A.**    Start with imminency. CAIR offers generic concerns about future harms but omits any evidence that these harms are "actual or imminent." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992). It worries, for example, about the loss of government benefits, but offers no concrete government contract or benefit that it was pursuing or even considering. "Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Id.*; *see also Corbett v. Transportation Sec. Admin.*, 930 F.3d 1225, 1233 (11th Cir. 2019) ("Immediacy requires that the anticipated injury occur within some fixed period of time in the future.").

Worse still, CAIR seeks to widen the possibility of future imminent harms by overreading the EO. It claims that the EO's provision denying government benefits to people providing material support to CAIR "significantly impair[s] CAIR's ability to petition the courts" by jeopardizing access to products like Microsoft Word and court

reporters. *See* PI Mot. 29. But the EO prevents no such thing. The EO incorporates the definition of "material support or resources" from Section 775.33, Florida Statutes. EO 4. As the statute makes clear, *providing* material support requires doing so "*knowingly*." Fla. Stat. § 775.33(3) (emphasis added). As part of the "old soil" transplanted into the EO, that mens rea requirement applies. *DeSantis v. Dream Defs.*, 389 So. 3d 413, 421 (Fla. 2024). CAIR has offered no reason to believe that any provider has *knowingly* provided resources to a designated terrorist organization.

CAIR has therefore not pointed to any Florida-government action that would amount to continued pressure from the EO. Instead, CAIR relies on its own members' declarations—which include unsubstantiated allegations—to establish an "imminent" injury. Tellingly, the declarations do not point to concrete examples but, rather, reference "fears," Dkt. 24-2, Pg. 7, 8, "concerns," *id.* at 8, and "hesitat[ions]," Dkt. 24-3, Pg. 5, of anticipatory harm.

So, it is no surprise that two of CAIR's core assertions of harm have not panned out. CAIR repeatedly warned that Plaintiffs faced a threat of future injury by being "denied access to the Florida Capitol for Muslim Day advocacy" and because the EO denied "access to government facilities." PI Mot. 12–13; *see also id.* at 28 (claiming impaired right to petition because the EO "prevent[s] CAIR from accessing government buildings"). Yet CAIR-Florida, in its own words, "celebrated the resounding success of

the 2026 Florida Muslim Day" at the Capitol, which included "impactful meetings with legislative staff" and a "significant victory for representation" in the Legislature.[45]

CAIR's harms regarding attorneys' fees are similarly ephemeral. It claimed loss of attorneys' fees and costs in an unrelated case as a harm from the EO, PI Mot. 10–11, but the court there has already ruled in CAIR's favor. *See Illoominate Media, Inc. v. CAIR Florida, Inc.*, No. 9:19-cv-81179-RAR, (S.D. FL. Jan. 29, 2026).

In sum, CAIR's allegations of past harms have not materialized. And that documented history only undermines its already speculative assertions of future harms. *See Bowen v. First Fam. Fin. Servs.*, 233 F.3d 1331, 1340 (11th Cir. 2000) (dismissing a theory of future harm that "perhaps or maybe" has a chance of occurring (quotation omitted)). CAIR has relied on nothing but a series of contingencies, mostly involving independent actors, to establish an injury. More is needed. *See Murthy*, 603 U.S. at 57.[46]

---

[45] *See* Press Release, CAIR-Florida Celebrates Successful 2026 Muslim Day at the Capitol, Muslim-American Heritage Resolution, CAIR-Florida (Feb. 3, 2026), https://perma.cc/58GH-YSY8. The fact that CAIR-Florida has access to the Capitol means that CAIR would have that same access as they are both covered by the EO. Plaintiffs claim CAIR-Florida was denied conference room space in the Capitol as another harm, Am. Compl. ¶ 25, but never explain how that denial was related to the EO. As explained by the declaration submitted with this response, the denial was not related to the EO. Arnold Decl. ¶ 10.

[46] In its retaliation claim, CAIR presumably asserts a "reputational" harm. *See* PI Mot. 11, 20. For standing purposes, plaintiffs must mount a reputational-harm argument with more than a cursory diversion-of-resources claim. *SJP I*, 2024 WL 371875, at *6. Here, CAIR asserts that resources have been diverted from journalism programs and scheduled events to responding to media and partner organizations. PI Mot. 7–8. For starters, those assertions hardly show *how* CAIR's reputation was harmed. *SJP I*, 2024 WL 371875, at 6. Secondly, it would appear that CAIR still coordinates with the

**B.**    CAIR's traceability and redressability problems are worse. To show a traceable chilling effect as CAIR claims, it must show more than personal displeasure with the EO. *Compare SJP II*, 2024 WL 374543, at *4 *with* Dkts. 24-1 *through* 24-3 (declarations of CAIR-affiliated individuals). "[E]vidence of subjective fear or anxiety, on its own, does not give rise to a cognizable constitutional injury." *SJP II*, 2024 WL 374543, at *4. Moreover, "the record is devoid of any evidence that [CAIR's] members . . . have self-censored" because of the EO. *SJP I*, 2024 WL 371875, at *4. By its own admission, CAIR-Florida continues its advocacy, including at the Capitol.

CAIR's remaining allegations of harm are not redressable by a court order. "To determine whether an injury is redressable, [the court] consider[s] the relationship between the judicial relief requested and the injury suffered." *Murthy*, 603 U.S. at 73 (quotation marks and citation omitted). Alleged anticipatory third-party injuries tied to requested prospective relief are non-redressable. The Supreme Court has explained that anticipatory third-party injuries involve non-parties "to the suit, and there is no reason [that those third parties] should be obliged to honor an incidental legal determination the suit produced." *Lujan*, 504 U.S. at 569.

---

media (by admission) and its own partner organizations (also by admission). *See* Dkts. 24-1–24-3. CAIR still engages in advocacy, and CAIR's actions to date demonstrate the same. The reputational "harm" stems not from the EO but from CAIR's pre-existing reputation.

The most concrete injury in CAIR's pleading involves an unnamed Florida-based production company that allegedly "withdrew" its production agreement with CAIR after the EO was announced. PI Mot. 10–11. Yet CAIR offers little to connect how that podcasting contract is redressable. The assumption is that this unnamed party would desire future government benefits or contracts, but CAIR never proves that. And when a "plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else,* much more is needed." *Lujan*, 504 U.S. at 562 (1992) (emphasis added). CAIR also supplies no reason to believe that the unnamed company is still willing and able to resume the contract if relief were granted. The unnamed party is not party "to the suit, and there is no reason they should be obliged to honor an incidental legal determination the suit produced." *Haaland v. Brackeen*, 599 U.S. 255, 293 (2023).[47]

In sum, CAIR's theory of standing rests on "amorphous threat[s] contingent upon" third-party actions or the so-far-non-existent enforcement actions of the State. *Cf. SJP I*, 2024 WL 371875, at *6. CAIR has not shown a likelihood of establishing standing.

---

[47] The same analysis applies to CAIR's allegations that the plaintiff in an unrelated case now refuses to pay court-ordered attorney's fees to CAIR and that unnamed mosques have limited their association with CAIR.

## II.    CAIR has not met the preliminary-injunction factors.

CAIR further falls short of establishing the likelihood of success on the merits of its claims. It offers a barrage of First Amendment claims, claiming that the EO (1) is impermissible viewpoint discrimination; (2) is retaliation for its protected speech; (3) infringes on its right to petition; and (4) has harmed its associational rights. *See* PI Mot. 14–33. Yet these claims assume critical facts found nowhere in the EO, ignore the deference owed to the executive branch when making determinations about public safety, and clash with precedent.

### A.    CAIR is unlikely to succeed on the merits of its First Amendment claims.

When it comes to designating terrorist groups, the "evaluation of the facts by the Executive . . . is entitled to deference." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33 (2010). That deference is akin to a "presumption of regularity" that courts do "not lightly discard." *Hartman v. Moore*, 547 U.S. 250, 263 (2006). And "where an organization is found to have supported terrorism, government actions to suspend that support are not unconstitutional." *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 735 (D.C. Cir. 2007). Indeed, "there is no First Amendment right nor any other constitutional right to support terrorists." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 166 (D.C. Cir. 2003).

Because supporting terrorism falls outside the scope of the First Amendment, free-speech challenges to terrorism designations fail, including when made pursuant to

an executive order. *See, e.g.*, *Islamic Am. Relief Agency*, 477 F.3d at 735; *Holy Land Found. for Relief & Dev.*, 333 F.3d at 166; *Kadi v. Geithner*, 42 F. Supp. 3d 1, 34 (D.D.C. 2012). Even if CAIR's conduct fell within the scope of the First Amendment, precedent militates against a likelihood of success on the merits.

### 1.    CAIR's free-speech claims are unlikely to succeed.

None of CAIR's free-speech claims—viewpoint discrimination, retaliation, coercion, or petition—are likely to succeed on the merits.

### i.    The Executive Order is not a regulation of speech, but if it were, it is viewpoint neutral, content neutral, and otherwise valid.

CAIR leads with the idea that the EO is infirm because it is viewpoint based by "imposing . . . unfavorable treatment upon a group advancing disfavored viewpoints." PI Mot. 17. That is unpersuasive for multiple reasons.

As a threshold matter, the EO is not a speech regulation. On its face, the EO has nothing to do with speech; it does not single out any speech for prior restraint or otherwise regulate what anyone may say. The EO instead identifies a group—CAIR—for designation as a terrorist organization based on that group's past *conduct*. *See Islamic Am. Relief Agency*, 477 F.3d at 735; *Holy Land Found. for Relief & Dev.*, 333 F.3d at 166; *Kadi*, 42 F. Supp. 3d at 34; *cf. TikTok Inc. v. Garland*, 604 U.S. 56, 67–69 (2025) (suggesting First Amendment scrutiny may not apply). In practice, the EO merely ensures that "public funds [are] spent for the purposes for which they were authorized" i.e. not supporting terrorism. *Rust v. Sullivan*, 500 U.S. 173, 196 (1991). To the extent CAIR

wishes to advocate in Florida, it is "free to do so without [state] assistance." *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 212 (2003) (plurality).

Since the EO contains no speech regulations, it is nonsensical to analyze whether those regulations are content or viewpoint based. The EO simply does "not implicate the First Amendment at all." *Norwegian Cruise Line Holdings Ltd v. State Surgeon Gen., Fla. Dep't of Health*, 50 F.4th 1126, 1135 (11th Cir. 2022); *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) (explaining that "restrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct"). The Court's analysis should end there.

Even if the EO implicated the First Amendment, it does not discriminate based on viewpoint. "All viewpoint discrimination is first content discrimination." *Harbourside Place, LLC v. Town of Jupiter*, 958 F.3d 1308, 1318 (11th Cir. 2020) (cleaned up) (affirming denial of preliminary injunction). But the text of the EO shows that it is not only viewpoint neutral, it makes no content-based distinctions whatsoever. Indeed, *not a single one* of the Governor's findings supporting CAIR's designation references speech. Not from CAIR itself, any founder, director, or member.

CAIR assumes strict scrutiny applies anyways by gesturing at "unfavorable treatment" it has allegedly received. PI Mot. 17. But the Supreme Court has twice rejected CAIR's effects-based reasoning. *See McCullen v. Coakley*, 573 U.S. 464, 480 (2014) ("[A] facially neutral law does not become content based simply because it may disproportionately affect speech on certain topics."); *Hill v. Colorado*, 530 U.S. 703, 724 (2000)

(Viewpoint discrimination is not triggered "simply because [an] enactment was motivated by the conduct of the partisans on one side of a debate.").

Faced with a content-neutral EO, CAIR invites this Court to look beyond the text and divine a viewpoint discriminatory motive based on circumstance. That conflates a claim that a law burdens speech with a retaliation claim of the sort that CAIR raises elsewhere. In any event, under settled precedent the Court must decline CAIR's invitation. S*ee United States v. O'Brien*, 391 U.S. 367, 383 (1968) ("[T]his Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive."); *In re Hubbard*, 803 F.3d 1298, 1313 (11th Cir. 2015) ("*O'Brien* teaches against striking down otherwise constitutional legislation on the basis of a speculated illicit legislative motive." (citation omitted)).[48]

And even if this Court entertained CAIR's viewpoint discrimination claim, it "cannot prevail on an *as-applied* [viewpoint-discrimination] challenge without showing that the law has in fact been . . . unconstitutionally applied to [it]." *McCullen*, 573 U.S. at 485 n.4. In other words, CAIR "must show that [it] was prevented from speaking while someone espousing another viewpoint was permitted to do so." *Id.*

---

[48] As recently as 2022, the Eleventh Circuit was "not aware of" any binding precedent "that relied on legislative history or statements by proponents to characterize as viewpoint-based a law challenged on free-speech grounds." *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1225 (11th Cir. 2022), *vacated on other grounds sub nom. Moody v. NetChoice, LLC*, 603 U.S. 707 (2024).

CAIR cannot meet that burden. Not only does the EO not restrict any speech, but various civic groups like FAITH and the ACLU continue to express viewpoints virtually identical to CAIR's positions.[49] These groups often act alongside CAIR to advance the same political and legal goals, but have not been designated as terrorist organizations because, unlike CAIR, they do not have a long history of ties to terrorism.

At any rate, the EO is valid. When assessing executive orders implicating security interests, courts ask "whether the policy is facially legitimate and bona fide." *Trump v. Hawaii*, 585 U.S. 667, 704 (2018). If so, "that would put an end to [any] review." *Id.* After all, "[a]ny rule of constitutional law that would inhibit the flexibility" of an executive "to respond to changing world conditions should be adopted only with the greatest caution." *Id.* CAIR does not allege the EO is facially illegitimate, nor does it contest that it is a bona fide executive order.

Alternatively, the EO should, at most, be assessed under intermediate scrutiny. *See Kadi*, 42 F. Supp. 3d at 31–34 (applying intermediate scrutiny and upholding terrorist

---

[49] *Compare* Am. Compl. ¶ 85, *with* Jewish Voice of Peace, *$27 million in divestment victories* (Dec. 5, 2025) (sharply criticizing "Israeli violence against Palestinians"), https://perma.cc/MDP8-DNGU, *and* Anthony Man, *There's no sharia law in the state, but South Florida lawmaker files bill to outlaw it anyway*, Sun Sentinel (Oct. 25, 2025) (Mark Winer, the President of the Foundation to Advance Interfaith Trust and Harmony, criticizing HB 119 alongside CAIR as "appealing to the hatred of Muslims"), 2025 WLNR 27763069, and ACLU Florida, *ACLU of Florida and CAIR Florida File Lawsuit Challenging Policy Denying Religious Meals to Muslim Inmates at Miami-Dade Jails* (Sept. 3, 2015) (ACLU advocating for civil rights of Muslim inmates alongside CAIR), https://perma.cc/KH3E-65VN.

designation after *Holder*); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 82 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003) (applying *O'Brien*'s intermediate scrutiny standard and upholding terrorist designation); *TikTok*, 604 U.S. at 73–80 (holding that TikTok-specific regulations satisfied intermediate scrutiny).

The EO easily clears the intermediate scrutiny standard. In fact, it would survive even under CAIR's incorrect standard of strict scrutiny. Thwarting terrorism is a textbook compelling government interest. *Holder*, 561 U.S. at 28–29. Barring government resources from supporting terrorism is simply a narrower subset of that compelling interest. As for tailoring, the Supreme Court in *Holder* upheld a material support provision virtually identical to the definition incorporated in the EO. *Compare id.* at 10 n.2, *with* EO 4 (incorporating Fla. Stat. § 775.33(l)(c)).

If anything, the EO is more narrowly tailored than the federal material-support framework. For one, it is not a criminal provision. Under the broadest interpretation, the EO prohibits government entities and entities "regulated by [] Executive or Cabinet Agenc[ies]" from providing "any contract, employment, funds, or other benefit or privilege" to designated terrorist organizations or those that provide them material support. EO 4. And this civil sanction, like its federal criminal counterpart, requires an individual to *knowingly* provide material support.[50] At bottom, the Governor has simply determined

---

[50] *See, supra*, at 15.

that Florida should not use its government resources to facilitate the activities of terrorist organizations.

To date, no court has accepted the theory that a terrorist designation is viewpoint based. This Court should not be the first.

### ii.    CAIR's alleged retaliation claim is deficient.

CAIR's theory is more aptly assessed under the retaliation rubric, but even then it falls short. To make out a retaliation claim, CAIR must clearly identify its protected speech, show the Governor's adverse action in response, and explain the causal connection between CAIR's statements and the supposed retaliation. *See Hartman*, 547 U.S. at 256, 260–65. "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019). The supposed retaliatory motive must be the "but-for cause" of an adverse action. *Hartman*, 547 U.S. at 260. But-for causation is a strict test, and when an intervening cause (such as probable cause for government action) exists, the causal link between speech and supposed retaliatory action is severed. *Id.* at 265.

Here, the Governor not only has probable cause to declare CAIR a terrorist organization, but CAIR's retaliation claim is otherwise plagued by causation issues.

***Probable cause.*** For retaliation cases challenging government action, plaintiffs must make a "threshold showing" that the government lacked "probable cause" to initiate the legal process. *Nieves*, 587 U.S. at 400, 404; *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1304 (11th Cir. 2019). Probable cause "is not a high bar" and "requires only

a probability or substantial chance of criminal activity, not an actual showing of such activity." *D.C. v. Wesby*, 583 U.S. 48, 57 (2018). Outside the strictures of a criminal prosecution, as is the case here, "probable cause is measured by a lesser standard." *DeMartini*, 942 F.3d at 1310 (quotation omitted).

CAIR favorably cites *Hartman* and *Nieves*, PI Mot. 18–19, and the Governor agrees that they set the proper legal backdrop. Retaliation claims hinge on an official's purportedly improper "state of mind," which is "easy to allege and hard to disprove." *Nieves*, 139 U.S. at 403 (cleaned up). "Any inartful turn of phrase or perceived slight during a legitimate [use of executive power]" can lead to "years of litigation," "dampen[ing] the ardor of all but the most resolute" public official. *Id.* (cleaned up).[51] Unchecked by robust requirements, retaliation claims paired with requests for injunctive relief threaten government efficacy. *See id.* Thus, the Eleventh Circuit has held, for example, that civil retaliatory lawsuit claims fail if the government establishes probable cause for the lawsuit. *DeMartini*, 942 F.3d at 1304.

The Governor plainly had probable cause here. Under Florida law, a terrorist organization is "any organized group engaged in or organized for the purpose of engaging in terrorism." § Fla. Stat. 874.03(7). Terrorism is any "activity that involves" a "violent act or an act dangerous to human life which is a violation of the criminal laws

---

[51] CAIR also cannot save its claim under the *Nieves* "exception" because "otherwise similarly situated" groups, such as FAITH and the ACLU, were "engaged in the same sort of protected speech." *DeMartini*, 942 F.3d at 1297.

of this state or the United States" and "is intended to intimidate, injure, or coerce a civilian population; influence the policy of a government by intimidation or coercion; or affect the conduct of government through destruction of property, assassination, murder, kidnapping, or aircraft piracy." § Fla. Stat. 775.30(1)–(2) (cleaned up). Courts interpret the phrase "act dangerous to human life" broadly. *See Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 690 (7th Cir. 2008) (Posner, J.) (en banc) ("Giving money to Hamas, like giving a loaded gun to a child (which [] is not a violent act), is an 'act dangerous to human life.'").

Ample evidence shows a "substantial chance," *Wesby*, 583 U.S. at 57, that CAIR is a group "organized for the purpose of engaging in terrorism" or an organized group that has "engaged in" terrorism.[52] CAIR disputes none of the following:

- CAIR originated from the Palestine Committee's 1993 Philadelphia meeting, where the express goal was to create a U.S. "cover" to support Hamas.[53]

- By 1994, internal Palestine Committee records identified CAIR as a part of the Palestine Committee.[54]

---

[52] To the extent the Court rejects the applicability of the "lack of probable cause" requirement for this retaliation claim, the same evidence proves that the Governor would have made the "same decision" regardless of CAIR's speech. *See Warren v. DeSantis*, 631 F. Supp. 3d 1188, 1198 (N.D. Fla. 2022) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)). Even under this alternative theory, precedent cuts in favor of upholding the EO and denying preliminary relief. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 148 F.4th 648, 655 (9th Cir. 2025).

[53] Vidino, *supra* n.5, at 25–26.

[54] *Id.* at 26.

- One of CAIR's founders, Omar Ahmad, was a powerful member of the Palestine Committee and exercised sizable influence over the HLF's terror financing.[55]

- Since CAIR's founding, numerous CAIR officials and affiliates have been convicted of terrorism-related offenses.[56]

- CAIR's role as an unindicted co-conspirator in the HLF terror financing scheme also points to a willingness to engage in acts dangerous to human life.[57] One of CAIR's founders, Omar Ahmad, was individually named as an unindicted co-conspirator in the HLF trial.[58] HLF, an organization dedicated to funneling support for Hamas, paid CAIR for "consulting services."[59]

- CAIR is also part of the Muslim Brotherhood. CAIR only challenges its individual designation as a terrorist organization. It does not, however, challenge the EO's designation of the "Muslim Brotherhood and any chapter or subdivision thereof" as terrorist organizations. EO 3. As a subdivision of the "Palestine Committee of the Muslim Brotherhood," CAIR's designation would stand regardless.

Though CAIR asks the Court to enjoin enforcement of the EO, it never engages with any of the evidence linking it to terrorism. That alone warrants denying the motion. At minimum, the Governor had probable cause to issue the EO.

---

[55] *See El-Mezain*, 664 F.3d at 530–31 (describing Ahmad's wiretapped statements); *see also* Vidino, *supra* n.5 at 20–25.

[56] *See supra* n.37.

[57] *Holy Land Found.*, 2009 WL 10680203, at *7.

[58] Josh Gerstein, *Report: Feds close probe of CAIR founder*, POLITICO (April 14, 2011), https://www.politico.com/blogs/under-the-radar/2011/04/report-feds-close-probe-of-cair-founder-035045.

[59] Vidino, *supra* n.5, at 26.

***CAIR cannot prevail under any standard.*** Even under a more relaxed causation test, CAIR has not shown retaliation. Because not every retaliatory act amounts to a "constitutional tort," viable retaliation claims require strict "but for" causation. *Nieves*, 587 U.S. at 399. Thus, CAIR must prove that "but for" its protected speech, it would not have been designated a terrorist organization. *Id.* And the further removed the alleged retaliation is from the protected speech, the less likely a plaintiff is to prove causation. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).[60]

When a government official's "First Amendment rights are implicated" by a plaintiff's retaliation claim, "special concerns" arise that militate against counting the official's speech towards causation. *DeMartini*, 942 F.3d at 1289 n.8; *see Dixon v. Burke Cnty.*, 303 F.3d 1271, 1275–76 (11th Cir. 2002). Courts also consider whether the 'face" of an allegedly retaliatory executive order demonstrates "retaliatory animus." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 148 F.4th 648, 655 (9th Cir. 2025).

Nothing on the face of the EO "express[es] any retaliatory animus." *Id.* That weighs against causation. *See id.* CAIR also muddles the analysis by leaning heavily on not their own speech but the *Governor's* protected speech. *See* PI Mot. 22. Counting a state official's protected speech against him to prove retaliation would undermine "the most fundamental First Amendment activities." *Green v. Finkelstein*, 73 F.4th 1258, 1266

---

[60] When considering First Amendment retaliation claims, the Eleventh Circuit has used Title VII cases to inform its analysis because "the two standards are consonant." *Akins v. Fulton Cnty.*, 420 F.3d 1293, 1301 n.2 (11th Cir. 2005).

(11th Cir. 2023) (quotation omitted). All the more for the State's chief executive officer, who must speak on pressing issues affecting Floridians. *See Republican Party of Minnesota v. White*, 536 U.S. 765, 781–82 (2002).

Thus, the Court should decline to factor any of the Governor's protected speech against him. *See DeMartini*, 942 F.3d at 1289 n.8; *Dixon*, 303 F.3d at 1275–76. Regardless, much of the Governor's cited political speech is from months and years ago and does not directly address CAIR. *See* PI Mot. 22. It lacks any temporal nexus to the EO.

Apart from the Governor's public statements, CAIR describes only two concrete examples of what it thinks spurred retaliation: CAIR's Students for Justice in Palestine (SJP) litigation and CAIR's October 14, 2025, press release. PI Mot. 22–24. Neither substantiates a retaliation claim.

CAIR argues that its unsuccessful litigation against various university officials, including the Governor, was the speech that prompted the Governor to designate CAIR as a terrorist organization. *See* PI Mot. 22–23. As this Court knows, those two cases started and ended more than two years ago.[61] Courts routinely reject retaliation claims where similar periods have elapsed between the speech and alleged retaliation.

---

[61] *See* Order Granting Motion to Dismiss, *Students for Just. in Pal. at the Univ. of S. Fla. v. Rodriguez, et al.*, 1:23-CV-281 (N.D. Fla. Feb. 1, 2024), DE 81; Order Granting Motion to Dismiss, *Students for Just. in Pal. at the Univ. of Fla. v. Rodriguez, et al.*, 1:23-CV-275 (N.D. Fla. Feb. 1, 2024), DE 52.

*See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (per curiam) (collecting cases).

Next, CAIR attempts to reverse engineer a retaliation claim by citing an October 14, 2025 press release condemning the Governor's "endorsement" of HB 119. PI Mot. 23–24. Yet a plain reading of the Governor's social media post shows that the Governor did not "endorse" HB 119. Moreover, plaintiffs become increasingly unlikely to prove causation once the period between speech and alleged retaliation stretches beyond a month. *See Faircloth v. Herkel Invs. Inc.*, 514 F. App'x 848, 852 (11th Cir. 2013) (one month is "not too protracted" but three months "cannot alone establish causation" (citations omitted)).

CAIR also ignores other confounding factors that complicate its theory of causation. During the two months separating CAIR's press release and the EO, academics and officials published a wave of material highlighting CAIR's past, current, and continuing ties to terrorism. The George Washington University's Center on Extremism, for example, released new work emphasizing CAIR's affiliation with known terrorists and shed new light on CAIR's roots in the Hamas support apparatus.[62] Then, on November 24, 2025, President Trump signed Executive Order 14262, directing federal officials to begin investigating whether "Muslim Brotherhood chapters or other

---

[62] Lara Burns et al., *supra* n.20.

subdivisions" should be designated as terrorist organizations under federal law.[63] The Governor consulted these materials, among others, in deciding to designate CAIR as a terrorist organization. Arnold Decl. ¶ 7. These intervening events, in addition to the temporal distance, undermine any causal link between CAIR's press release and the EO. *Cf. Thomas v. Marshall Pub. Schs.*, 152 F.4th 884, 892 (8th Cir. 2025). And, again, CAIR has not even attempted to refute its many demonstrated links to terror over the years.[64]

### iii.    The coercion claim fails as a matter of law.

Next, to make out a coercion claim, CAIR must clearly present state action that could be reasonably understood to convey a threat of adverse action against third parties meant to punish or suppress CAIR's speech. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67–68 (1963). Ultimately, coercion occurs when government officials do indirectly what they are barred from doing directly. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024). But facially valid government action cannot amount to coercion, *see Trump*, 585 U.S. at 704; *TikTok*, 604 U.S. at 70–71, and here, Florida is entitled to attempt to stamp out terror.

CAIR's coercion claim is based on the flawed notion that the EO is founded upon viewpoint discrimination. But the opposite is true. On its face, the EO addresses

---

[63] Executive Order 14262, https://www.federalregister.gov/documents/2025/11/28/2025-21664/designation-of-certain-muslim-brotherhood-chapters-as-foreign-terrorist-organizations-and-specially

[64] For the same reasons, CAIR's association and petition claims fail to the extent they allege retaliation against CAIR's prior association and petitioning activities.

*conduct*: terrorism and material support for terrorism. It therefore does not implicate the First Amendment at all. Moreover, CAIR has not pointed to any state action that would amount to coercion of third parties. CAIR does not allege that the State threatened the unknown podcast company or the unknown mosques with sanctions for supposedly materially supporting CAIR.[65] Thus, *Vullo* is inapposite.[66] If any speech is involved, however, the EO nevertheless passes muster.

*Holder v. Humanitarian Law Project* is instructive, involving a substantially similar material-support definition. *See* 561 U.S. at 8–9. The Humanitarian Law Project wished to support two terrorist organizations by (1) training them to use humanitarian and international law to peacefully solve conflict; (2) teaching them to seek U.N. relief; and (3) engaging in coordinated political advocacy with them. *Id.* at 36–38. As applied to that expression, the Supreme Court held the federal government's material-support statute survived First Amendment scrutiny. *Id.* at 36–39.[67]

---

[65] Moreover, the definition of "material support" in the Florida Statutes expressly excludes "religious materials." Fla. Stat. § 775.33(c). Thus, the EO does not stand as an obstacle to mosques engaging in protected religious expression with CAIR.

[66] CAIR's citation of *Floridians Protecting Freedom, Inc. v. Ladapo*, 754 F. Supp. 3d 1165 (N.D. Fla. 2024), fares no better. In *Ladapo*, the State had claimed that the plaintiff's TV advertisement was categorically false and sought to have it removed from the air. *Id.* at 1171. Not so in this case. The EO is premised on unprotected *conduct*, not on any viewpoint.

[67] If CAIR were to claim that the EO deters a third party from engaging in expressive conduct that supports CAIR, then the *O'Brien* test would apply. *Holder*, 561 U.S. at 26–27 (citing *United States v. O'Brien*, 391 U.S. 397, 403 (1968)).

"Everyone agrees," the Court explained, "that the Government's interest in combating terrorism is an urgent objective of the highest order." *Holder*, 561 U.S. at 28; *see also id.* at 34 (noting "the lack of competence on the part of the courts" in this setting (quotation omitted)); *Winter*, 555 U.S. at 24. To achieve that objective, the government employed a preventative measure, criminalizing "aid that makes [terrorist] attacks more likely to occur." *Holder*, 561 U.S. at 35. With deference in mind, the Court concluded that the government's interest in preventing terrorism outweighed a third party's desire to materially support terrorist organizations "even if the supporters meant to promote only the groups' nonviolent ends." *Id.* at 36.[68]

Here, CAIR never explains how the State has "coerced" a third party based on any supposed third party's material support. But even if CAIR had adequately done so, it still has not shown a likelihood of success on the merits. Indeed, protection of public health and safety "is a paramount governmental interest," which the Governor seeks to pursue through the EO. *See Hodel v. Va. Surface Mining & Reclamation Ass'n.*, 452 U.S. 264, 299–300 (1981). The EO's denial of government benefits to entities that materially support designated terrorist organizations is the least restrictive means of achieving these compelling interests. The Governor made an "informed judgment" about terrorist organizations and how to best protect the citizens of Florida. *TikTok*, 604 U.S. at 75.

---

[68] Because "[m]oney is fungible," material support to a terrorist organization—even toward a non-violent end—allows the organization to direct more resources to terrorism. *Holder*, 561 U.S. at 31.

His judgment, based on a wealth of information connecting CAIR to terrorism, is afforded "substantial respect" in this setting. *Id.*; *see also Holder*, 561 U.S. at 35–36.

On this record, CAIR cannot overcome the deference and respect owed to the State for the safety of its citizens.

### 2.    CAIR's association claim is unlikely to succeed.

*Holder* also refutes CAIR's First Amendment association claim. The plaintiffs there, like CAIR, pled an association claim in addition to their free-speech claim. 561 U.S. at 39. The Supreme Court rejected the association claim "because the [material support] statute does not penalize mere association with a foreign terrorist organization." *Id.* The federal statute, like the state statute and EO here, "does not prohibit being a member of one of the designated groups or vigorously promoting and supporting the political goals of the group," but rather "the act of giving material support." *Id.*; *see also Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev.*, 291 F.3d 1000, 1026 (7th Cir. 2002); *United States v. Chandia*, 514 F.3d 365, 371 (4th Cir. 2008) ("[T]he statute 'does not prohibit mere association; it prohibits the *conduct* of providing material support to a designated FTO'" (quotation omitted)).

The EO similarly does not obstruct any right of association. Individuals and organizations may associate with CAIR without jeopardizing their ability to obtain contracts, employments, funds, or other benefits or privileges. *See Boim*, 291 F.3d at 1026.

The EO addresses "only the provision of material support," which is not the same as association. *Id.*[69]

### 3.    CAIR's petition claim is unlikely to succeed.

Nor will CAIR's novel petition claim succeed. As explained above, the EO withstands any level of scrutiny. The EO's material-support provision targets conduct other than petitioning, and leaves CAIR free to petition the government for redress of grievance. And even if the EO did burden CAIR's right to petition, it is the least restrictive means of advancing compelling governmental interests. *See Borough of Duryea v. Guarnieri*, 564 U.S. 379, 389 (2011) (applying free speech precedent to a petition claim in light of "the extensive common ground in the definition and delineation of these rights").

### B.    CAIR's claims of irreparable injury are weak and undermined by delay.

Merits aside, the Court should deny a preliminary injunction because CAIR is not suffering irreparable harm. To show irreparable harm, CAIR must demonstrate that the harm is "neither remote nor speculative, but actual and imminent." *Ne. Fla. Ch. of the Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (quotation omitted); *Swain*, 961 F.3d at 1292 (Plaintiff must "suffer irreparable injury unless the injunction issues") (quotation marks and citation omitted).

---

[69] This distinguishes *National Association for Advancement of Colored People v. Button*, which held that a Virginia statute burdened association by prohibiting the NAACP from advising its members to seek the assistance of particular attorneys. 371 U.S. 415, 433 (1963).

CAIR has not shown that it faces actual, imminent harm. CAIR admits it has still engaged in advocacy after the EO issued. *E.g.*, Dkt. 24-3, at 7–8. CAIR has not alleged that the State has treated it or any third party differently because of the EO. CAIR has lost no past, present, or future government contracts. Moreover, CAIR's apparent concern "about potential negative publicity," related to "reputation and goodwill," is speculative and inadequate to demonstrate a clear and present need for equitable relief." *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 952 (8th Cir. 2023) (quotation omitted).

Delay in seeking injunctive relief also "militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com*, 840 F.3d 1244, 1248 (11th Cir. 2016); *see also Benisek v. Lamone*, 585 U.S. 155, 159 (2018); 11A Fed. Prac. & Proc., § 2948.1 (3d ed. 2025 update). CAIR waited a month and a half to ask the Court to preliminarily enjoin the EO, which is *not* complex. It has offered no explanation for the delay.

## C. The public interest and balance of the equities disfavor preliminary relief.

Finally, the public interest and balance of the equities—which merge when the government is the defendant, *Nken v. Holder*, 556 U.S. 418, 435 (2009)—favors the Governor. The State has a "paramount governmental interest" in protecting public safety. *Hodel*, 452 U.S. at 300. "Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'" *S. Bay United Pentecostal Church v. Newsome*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring) (citation omitted). By blocking contracts and other

government benefits to terrorist organizations and those who provide them material support, the EO furthers the health and safety of Floridians. Preliminary relief for CAIR is inappropriate.

## CONCLUSION

The Court should deny the motion for a preliminary injunction.

February 11, 2026

Respectfully submitted,

JAMES UTHMEIER
  *Attorney General*

*/s/ Jeffrey Paul DeSousa*
JEFFREY PAUL DESOUSA (FBN 110951)
  *Acting Solicitor General*
JASON J. MUEHLHOFF
  *Chief Deputy Solicitor General*
SAMUEL F. ELLIOTT (FBN 1039898)
  *Deputy Solicitor General*
TYLER E. GUSTAFSON (FBN 1049292)
  *Assistant Solicitor General*
CASEY J. WITTE (FBN 1070288)
  *Solicitor General Fellow*
JAMES WACZEWSKI (FBN 0154989)
  *Special Counsel*
OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, Florida 32399
(850) 414-3300
*jeffrey.desousa@myfloridalegal.com*
*jenna.hodges@myfloridalegal.com*

*Counsel for Governor DeSantis*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been furnished by electronic service through the CM/ECF Portal on February 11, 2026, to all counsel of record.

*/s/ Jeffrey Paul DeSousa*
*Acting Solicitor General*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(F) and this Court's order allowing a reasonable amount of words over the local rule, I certify that this memorandum contains 8,890 words, inclusive of headings, footnotes, and quotations, according to the word-processing system used to prepare it.

*/s/ Jeffrey Paul DeSousa*
*Acting Solicitor General*