## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

CAIR-FOUNDATION, INC. and
CAIR-FLORIDA, INC.,

      *Plaintiffs,*

   v.

RONALD DESANTIS, in his official
capacity as Governor, State of
Florida,

      *Defendant.*

Case No. 4:25-cv-516-MW-MJF

## DEFENDANT'S NOTICE OF APPEAL

Notice is hereby given that the Defendant, Ronald DeSantis, in his official capacity as Governor of the State of Florida, appeals to the United States Court of Appeals for the Eleventh Circuit this Court's Order Granting Motion for Preliminary Injunction (ECF No. 43) that was entered on March 4, 2026, attached hereto as Exhibit A.

1

Dated: March 6, 2026

Respectfully submitted,

JAMES UTHMEIER
  *Attorney General*

RYAN D. NEWMAN
  *Chief Deputy Attorney General*

DAVID M. S. DEWHIRST
  *Solicitor General*

*/s/ Jeffrey P. DeSousa*
JEFFREY P. DESOUSA (FBN 110951)
JASON J. MUEHLHOFF
  *Chief Deputy Solicitors General*
TYLER E. GUSTAFSON (FBN 1049292)
  *Assistant Solicitor General*
CASEY J. WITTE (FBN 1070288)
  *Solicitor General Fellow*

OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, Florida 32399
Phone: (850) 414-3300
*jeffrey.desousa@myfloridalegal.com*
*jenna.hodges@myfloridalegal.com*

*Counsel for Defendant*

2

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 6, 2026, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties.

/s/ *Jeffrey P. DeSousa*
Chief Deputy Solicitor General

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**CAIR-FOUNDATION, INC., and**
**CAIR-FLORIDA, INC.,**

   *Plaintiffs,*

v.            **Case No.:  4:25cv516-MW/MJF**

**RONALD DESANTIS, in his official**
**capacity as Governor, State of Florida,**

   *Defendant.*

_____/

## ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

The question before this Court is whether the Governor can, in a non-emergency situation, unilaterally designate one of the largest Muslim civil rights groups in America as a "terrorist organization" and withhold government benefits from anyone providing material support or resources to the group.[1] This Court finds he cannot. The First Amendment bars the Governor from continuing the troubling trend of using an executive office to make a political statement at the expense of others' constitutional rights. The Governor's decree coerces third parties, under threat of losing government benefits, to disassociate from the Council on American-

---

[1] The October 7, 2023, terror attacks in Israel were horrific. Full stop. Hamas is a wicked organization. Full stop. Antisemitism is abhorrent and has resulted in the greatest atrocities in human history. Full stop. But this case does not turn on these indisputable facts. In this case, this Court must answer only the narrow question of whether the Governor's executive order violates the First Amendment.

Islamic Relations ("CAIR"), thereby closing avenues of expression and suppressing CAIR's protected speech. Once again, Florida chooses political posturing over the First Amendment. *See, e.g.*, *Floridians Protecting Freedom, Inc. v. Ladapo*, 754 F. Supp. 3d 1165 (N.D. Fla. 2024).

## I

On December 8, 2025, Governor Desantis signed Executive Order 25-244 titled "Protecting Floridians from Radical Islamic Terrorist Organizations" (the "EO"). ECF No. 24-4. The EO designates CAIR as a terrorist organization and prevents CAIR or "any person known to have provided material support or resources" to CAIR "from receiving any contract, employment, funds, or other benefit or privilege" from executive or cabinet agencies or from any county or municipality of the state.[2] *Id.* at 4–5.

---

[2] The EO follows in the wake of a November 18, 2025, proclamation issued by Texas Governor Greg Abbott designating CAIR a foreign terrorist and transnational criminal organization under Texas penal and property codes and subjecting persons aiding CAIR to heightened civil penalties. *Proclamation by the Governor of the State of Texas* (Nov. 18, 2025), https://gov.texas.gov/uploads/files/press/PROC_declaring_Muslim_Brotherhood_and_CAIR_Tr ansnational_Criminal_Organizations_IMAGE_11-18-2025.pdf.

Texas branches of CAIR have moved to enjoin enforcement of the proclamation, however a decision is not imminent in that action as the parties are engaged in discovery on the motion for preliminary injunction and the briefing is incomplete. *See Council on American-Islamic Relations Texas Dallas Fort Worth et al v. Abbot et al*, 1:25-cv-01878-ADA (W.D. Tex. Feb. 26, 2026) (scheduling order including discovery deadlines and noting plaintiffs' reply in support of their motion for preliminary injunction is not due until March 27, 2026). By contrast, in this case, the parties chose not to engage in discovery, the matter is fully briefed, and the parties have opted to dispense with a hearing to facilitate a quicker decision. *See* ECF No. 40 (order cancelling hearing).

CAIR-Foundation, Inc., and CAIR-Florida, Inc., filed suit against the Governor one week after the EO was issued.[3] Thereafter, Plaintiff CAIR-Foundation, Inc., moved for a preliminary injunction enjoining Defendant from enforcement of the EO, arguing the EO violates its First Amendment right to free speech because the EO discriminates based on viewpoint, was issued in retaliation for Plaintiff's protected speech, and coerces third parties to disassociate from Plaintiff. Plaintiff also argues the EO violates its First Amendment rights to petition and association.

For the reasons below, this Court finds Plaintiff is entitled to a preliminary injunction on its coercion claim. Accordingly, this Court does not address Plaintiff's alternative theories for relief. *See In re Snyder*, 472 U.S. 634, 643 (1985) (explaining the Court need not reach constitutional issues if they are not necessary to the disposition of the case).

II

A district court may grant a preliminary injunction if the movant shows: (1) it has a substantial likelihood of success on the merits, (2) it will suffer irreparable injury unless the injunction issues, (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party, and (4) if

---

[3] While the initial complaint contained a prayer for injunctive relief, *see* ECF No. 1 at 33–35, a formal motion for preliminary injunction was filed in January 2026. ECF No. 24.

issued, the injunction would not be adverse to the public interest. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). A "preliminary injunction is an extraordinary and drastic remedy." *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983). It should only be granted if "the movant 'clearly carries the burden of persuasion' as to the four prerequisites." *Id.* (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974)).

This Court begins with whether Plaintiff has shown a substantial likelihood of success on the merits. This Court addresses this factor first because typically, if a plaintiff cannot "establish a likelihood of success on the merits," this Court "need not consider the remaining conditions prerequisite to injunctive relief." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002). Because standing is always "an indispensable part of the plaintiff's case," this Court begins its merits analysis with standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

A

Over time, the Supreme Court has developed a three-part test for determining when standing exists. Plaintiff must show (1) that it suffered an injury-in-fact that is (2) traceable to the defendant and that (3) can likely be redressed by a favorable ruling. *See Lujan*, 504 U.S. at 560–61. And "where a plaintiff moves for a preliminary injunction, the district court ... should normally evaluate standing 'under

4

the heightened standard for evaluating a motion for summary judgment.' " *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 (6th Cir. 2018) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912 (D.C. Cir. 2015)); *see also Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011). Thus, "a plaintiff cannot 'rest on such mere allegations, [as would be appropriate at the pleading stage,] but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true.' " *Cacchillo*, 638 F.3d at 404 (some alteration in original) (quoting *Lujan*, 504 U.S. at 561).

This Court finds that Plaintiff has demonstrated standing on its coercion claim.[4] With respect to that claim, Plaintiff's theory of standing is not based on direct censorship of its speech, but rather on Defendant's coercion of third parties to cut ties with Plaintiff, thereby creating a prior restraint to Plaintiff's future speech.[5]

---

[4] This Court recognizes that standing is not "dispensed in gross," and "plaintiffs must demonstrate standing for each claim that they press, against each defendant, and for each form of relief that they seek." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)). But because this Court finds that Plaintiff is entitled to preliminary injunctive relief on its coercion claim, this Court need not address Plaintiff's standing to bring its other claims.

[5] At the outset, this Court notes there is significant overlap between this Court's standing analysis and the merits discussion *infra*. This Court recognizes that, due to the overlap, the issues relevant to standing may be addressed in the merits discussion. However, this Court has an independent obligation to ensure that standing, as "perhaps the most important" judicial doctrine, is established, and therefore addresses standing in full. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)).

5

To start, Plaintiff has demonstrated that it suffered an injury-in-fact when a Florida-based production company withdrew from an agreement to produce a podcast with Plaintiff because of the EO. The podcast was "intended to support CAIR's public education and civil rights work through interviews, commentary, and other expressive content." ECF No. 24-2 ¶ 26. When the production company withdrew from the agreement, Plaintiff lost both "more immediate and future speech opportunities for CAIR's advocacy." ECF No. 24 at 11. As such, this injury to Plaintiff's free speech right is actual and ongoing. Moreover, this injury is both traceable to Defendant and redressable by an injunction prohibiting Defendant from taking action based on the EO as it applies to CAIR. Specifically, Plaintiff's evidence demonstrates that the production company withdrew from the proposed agreement due to the EO and that it would reconsider associating with Plaintiff if the EO is found unlawful. ECF No. 41-1 ¶ 7. In other words, Defendant's threat convinced a third party—the production company—to suppress Plaintiff's future speech by withdrawing from their proposed agreement. Inasmuch as the production company will reconsider this withdrawal in the event the EO is deemed unlawful, an order prohibiting the EO's enforcement as to CAIR would redress Plaintiff's ongoing speech injury by permitting Plaintiff's podcast agreement to move forward without the specter of government consequences looming over those involved.

6

To be clear, the production company did not act unreasonably in withdrawing from its agreement with Plaintiff. To the contrary, it reacted to the EO in a predictable manner. Indeed, Plaintiff's evidence underscores that others have reacted in a similar way. For example, the South Florida Muslim Conference was scheduled to take place at the Coral Springs Center for the Arts in late January 2026. *See* ECF No. 41-4 at 3. The annual conference is put on by the South Florida Muslim Federation, whose membership includes Plaintiff's affiliated chapter, CAIR-Florida, Inc. *Id*. However, on January 23, 2026, Attorney General Uthmeier posted on social media that "Coral Springs should remember that state and local resources cannot be used by any organization affiliated with CAIR" and that "[t]he city commission is on notice." ECF No. 41-3. Thereafter, the South Florida Muslim Federation publicly disassociated from Plaintiff's affiliated chapter, explicitly citing the EO as the reason:

> The South Florida Muslim Federation takes pride in its role representing the Muslim Community in South Florida. The Council on American and Islamic Relations of Florida (CAIR-FL) has been a member of the South Florida Muslim Federation ("SFMF") since the inception of SFMF.
>
> CAIR-FL has always played an important role protecting the civil rights of Muslims, and we have never observed any conduct on the part of CAIR-FL that would remotely resemble terrorism. That being said, we understand the Governor issued an Executive Order on December 8, 2025 purporting to designate CAIR-FL a "foreign terrorist organization." We also understand that CAIR-FL has challenged this designation in Federal Court.

> While the issue is still pending in Federal Court and in an abundance of caution, we have removed all associations of SFMF with CAIR-FL. And we look to our courts to provide guidance on this in the future.

ECF No. 41-4 at 3.

While not determinative, this evidence further supports Plaintiff's theory of standing inasmuch as it "does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). Here, the EO predictably "deter[s] third parties from associating with CAIR," ECF No. 24 at 14. And, as this evidence demonstrates, they are deterred based on reasonable fears concerning the reach of the EO's prohibitions and the explicit threat of consequences in the event they fail to heed Defendant's EO. *See, e.g.*, ECF No. 41-3 at 2 (AG Uthmeier's post warning that the "city commission is on notice," and that "Coral Springs should remember that state and local resources cannot be used by any organization affiliated with CAIR"); ECF No. 41-5 at 2 (AG Uthmeier's post warning that "Any entity that wants to do business or use state or local resources in Florida would be wise to dissociate from CAIR.")[6].

---

[6] The Attorney General uses the term "dissociate," while this Court employs the term "disassociate." Both terms arguably mean the same thing and can be used interchangeably.

In short, Plaintiff has been publicly designated a terrorist organization from Florida's bully pulpit[7] and continues to suffer for it. Plaintiff's speech injury is concrete and neither speculative nor conjectural. It is traceable to Defendant's EO, which explicitly threatens the loss of government benefits to third parties who run afoul of its prohibitions and who have reliably heeded the State's warning that it "would be wise to dissociate from CAIR," given the EO's broad restrictions.[8] An

---

[7] The origin of the term "bully pulpit," as described by Merriam Webster, is enlightening:

> Bully pulpit comes from the 26th U.S. president, Theodore Roosevelt, who observed that his time in office at the White House was a bully pulpit when he said, "I suppose my critics will call that preaching, but I have got such a bully pulpit!" For Roosevelt, bully was an adjective meaning "excellent" or "first-rate"—not today's familiar noun bully referring to an abusive meanie. Roosevelt understood the modern presidency's power of persuasion and recognized that it gave the incumbent the opportunity to exhort, instruct, or inspire. He took full advantage of his bully pulpit, speaking out about the danger of monopolies, the nation's growing role as a world power, and other issues important to him. Since the 1960s, bully pulpit has been used as a term for a public position—especially a political office—that provides one with the opportunity to widely share one's views.

*Bully pulpit*, Merriam Webster, https://www.merriam-webster.com/dictionary/bully%20pulpit.

Unfortunately, in this instance, Defendant is choosing to be a bully—in the familiar sense of the term—from his pulpit. While Defendant certainly has the right to speak for himself and his office, to select the views he wishes to express, and to attempt to persuade the public to share his views, the Supreme Court has drawn a line between permissible persuasion and unconstitutional coercion. As explained in more detail below, Defendant has crossed that line.

[8] Over the past decade, a cottage industry of crafting law—be it legislative action or executive order—that has a very real effect on real people but is otherwise unreviewable for myriad reasons has cropped up across this country. This Court has recognized multiple examples of this trend in other cases. *See, e.g.*, *Link v. Diaz*, 669 F. Supp. 3d 1192, 1196 (N.D. Fla. 2023) (Walker, C.J.) ("[A]ccording to Plaintiffs, Florida has created a statutory scheme of interrelated provisions that creates a subjective fear of punishment and chills speech, that was designed to chill certain speech, that is intentionally ambiguous in operation, and that lacks direct enforcement mechanisms by state actors, such that Florida can avoid any pre-enforcement challenge by crafting the laws at

9

injunction prohibiting its enforcement as applied to CAIR is substantially likely to redress Plaintiff's ongoing speech injury. In short, Plaintiff has standing.

Having determined that Plaintiff has standing with respect to its First Amendment coercion claim, this Court turns to the merits of that claim.

B

Plaintiff contends that preliminary injunctive relief is necessary to prevent future harm and to remedy ongoing harm to its First Amendment right to free speech due to Defendant's coercion of third parties to suppress its speech. As evidence of the coercive nature of Defendant's EO, Plaintiff points to a Florida-based production company that withdrew from a proposed podcast agreement to launch Plaintiff's civil rights podcast, citing its concerns about the EO, and notes that the company would reconsider its withdrawal from the agreement in the event the EO was found

---

issue to avoid Article III's standing requirements."); *id*. ("This tactic has been employed to violate once-recognized constitutional rights and is likely to be used again, aided by the ever-evolving standing jurisprudence that binds this Court.") (citing *Whole Woman's Health v. Jackson*, 595 U.S. 30, 59 (2021) (Roberts, C.J., concurring in part) ("Texas has employed an array of stratagems designed to shield its unconstitutional law from judicial review . . . . The clear purpose and actual effect of S.B. 8 has been to nullify this Court's rulings."))); *see also Link*, 669 F. Supp. 3d at 1203 n.9 (citing *Support Working Animals, Inc. v. Moody*, Case No. 4:19CV570-MW/MAF, 2020 WL 10728640, at *1 (N.D. Fla. June 12, 2020), *aff'd sub nom. Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198 (11th Cir. 2021)) (dismissing action challenging state constitutional amendment that eliminated an entire industry with no recourse due to lack of implementing legislation identifying state actor with authority to enforce challenged law)). But here, Defendant has been too clever by half in attempting to evade review and, instead, runs afoul of the prohibition against doing indirectly what he cannot do directly. *See Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 190 (2024) ("[A] government official cannot do indirectly what []he is barred from doing directly: A government official cannot coerce a private party to punish or suppress disfavored speech on [his] behalf.").

to be unlawful. *See, e.g.*, ECF No. 41-1 ¶ 7. For the reasons set out below, this Court finds Plaintiff is substantially likely to succeed on the merits of this claim.

Where a government uses the "threat of invoking legal sanctions and other means of coercion . . . to achieve the suppression" of disfavored speech, it functionally creates "a system of prior administrative restraints" that bears "a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67, 70 (1963). A government official "cannot do indirectly what [he] is barred from doing directly: . . . coerce a private party to punish or suppress disfavored speech on [his] behalf." *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175 (2024). The present case bears all the hallmarks of unconstitutional coercion that the Supreme Court identified in *Bantam Books* and *Vullo*.

In *Vullo*, the Court held that to state a claim for First Amendment coercion, a plaintiff "must plausibly allege conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress speech." 602 U.S. at 191. Relevant factors for this Court's consideration include the power the government official wields, whether the communications in question could reasonably be understood as a threat or inducement, and the reaction from the recipient. *Id.*

First, Defendant's authority. "Generally speaking, the greater and more direct the government official's authority, the less likely a person will feel free to disregard

11

a directive from the official." *Id.* at 192. This factor is at its zenith here where Defendant is Florida's head of government and controls Florida's executive branch and cabinet agencies.[9]

Second, the communication. Defendant's EO designates Plaintiff by name as a "terrorist organization[]." ECF No. 24-4 at 4. And it prohibits *anyone* who provides material support or resources to Plaintiff from receiving *any* benefit or privilege from any Executive or Cabinet Agency, any entity regulated by an Executive or Cabinet Agency, or any county or municipality in Florida. *Id.* at 5 (citing § 775.33(1)(c), Fla. Stat.). The threat here is sweeping and clear. Any relationship with Plaintiff will be punished by cutting off access to all benefits even peripherally within Defendant's control.[10]

---

[9] A coercion claim does not require the source of the coercive [threats] to actually have the "power to apply formal legal sanctions." *Bantam*, 372 U.S. at 67. Informal censorship, that is, "the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation," "may sufficiently inhibit the circulation of publications to warrant injunctive relief." *Id.*

[10] The threat applies directly to state agencies, counties, municipalities and private parties—namely, "any entity regulated" by such state agencies. And the threat extends to any individual or entity that wishes to receive a contract, employment, funds, or other benefit or privilege from such agencies, counties, municipalities, or regulated entities.

Moreover, while not determinative here, the EO intimates that providing material support to CAIR is, itself, a crime under Florida law. *See* ECF No. 24-4 at 5 (citing Fla. Stat. § 775.33(1)(c)). Likewise, in purporting to name CAIR a "terrorist organization," the EO arguably amounts to a criminal accusation against CAIR and any member thereof. *See* § 874.03(7), Fla. Stat. (defining "terrorist organization"); § 775.34, Fla. Stat. (criminalizing willful membership in a designated foreign terrorist organization).

Of course, Defendant lacks the authority to unilaterally amend the Florida Statutes to create a new criminal offense or to designate CAIR as a foreign terrorist organization independent of the

Contrary to Defendant's assertion, ECF No. 37 at 33, the threat need not be *personalized* to be actionable. Although a number of cases discussing unconstitutional coercion do so in the context of a specific, personalized communication directed at an individual third party—say, a letter to a credit card company, *see Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015)—courts have also found unconstitutional coercion when the threat is addressed to the public more broadly in the form of an Executive Order. *See Wilmer Cutler Pickering Hale and Dorr LLP v. Executive Office of President*, 784 F. Supp. 3d 127, 153 (D.D.C. 2025) (finding executive order violated First Amendment because, among other things, it "attempts to suppress WilmerHale's speech indirectly by pressuring the firm's federal contractor clients to terminate their relationship with the firm or face cancellation of their contracts"). What matters is whether Defendant, a public official, has made "oral or written statements," which "can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request." *Okwedy v. Molinari*, 333 F.3d 339 (2d

---

laws the Florida Legislature has put in place for such designations. *See, e.g.*, Fla. Stat. §§ 775.32(1)(b) and 775.33(1)(a). Even so, the language of the EO raises the specter of criminal penalties and arguably contributes to some confusion about its force and effect with respect to potential criminal penalties. *See* ECF No. 24-4 at 5 ("The Florida Department of Law Enforcement and the Florida Highway Patrol are directed to undertake all lawful measures to prevent unlawful activities in Florida by the terrorist organizations designated in Section 1."). Unsurprisingly, even the Attorney General of Florida appears to be confused. *See, e.g.*, ECF No. 41-6 at 2 (Post by AG Uthmeier referring to CAIR as a "designated *foreign* terrorist organization under state law" (emphasis added)).

Cir. 2003) (quoting *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983)). Here, Defendant has acted by issuing a written statement, the EO, which in no uncertain terms threatens to cut off "any contract, employment, funds, or other benefit or privilege" to third parties who wish to provide resources to Plaintiff. Defendant's mode of communication in the form of an Executive Order, with all the trappings of official state action, and the explicit prohibition on benefits for those who provide material support or resources to Plaintiff leave no room for doubt as to the consequences the podcast producers—or any other third party that wished to work with Plaintiff in Florida—will face in the event they violate the EO.

Third, the reaction from the coerced party. Plaintiff attests that the production company withdrew from the parties' agreement, citing concern for consequences it might face for associating with Plaintiff. ECF No. 24-2 ¶ 26; ECF No. 41-1 ¶ 7. In other words, the production company interpreted the EO as a threat to disassociate from Plaintiff and responded accordingly. The fact that the company indicated to Plaintiff that it would reconsider its decision were the EO found unlawful, ECF No. 41-1 ¶ 7, further suggests that it views the EO as the sole impediment to the parties' agreement to platform Plaintiff's speech.[11]

---

[11] The Supreme Court has also noted other facts that, when "viewed in context, reinforce" a First Amendment coercion claim. *Vullo*, 602 U.S. at 193. For example, in *Vullo*, the Supreme Court pointed to a press release, "issued on official letterhead," that "singled out the NRA and other gun-promotion organizations as the targets of her call to action." *Id*. at 194. Likewise, the Court noted "[a] follow-on tweet from [Governor] Cuomo [that] reaffirmed the message:

14

Defendant's EO threatens those who platform, collaborate with, or otherwise provide support to Plaintiff. The "vice of the system" here is the same one the Supreme Court proscribed in *Bantam Books*. 372 U.S. at 69. There, threats and coercion subjected the distribution of publications "to a system of prior administrative restraints" untethered from any procedural safeguards. *Id.* at 70. By imposing the specter of punishment on intermediary book distributors, the state "directly and designedly stopped the circulation of publications in many parts of" the state. *Id.* at 68. This case is no different. Much like the distributors in *Bantam Books*, the production company is an intermediary intending to platform Plaintiff's speech. By threatening the production company—indeed, by broadly threatening anyone who wishes to do business in Florida—Defendant stifles Plaintiff's speech.

---

Businesses in New York should 'consider their reputations and revisit any ties they have to the NRA, which he called an extremist organization.' " *Id.* (internal quotation marks omitted).

Here, too, Plaintiff points to a subsequent post on X.com by Attorney General Uthmeier, which doubles down on the terrorist designation in Defendant's EO, warns the city of Coral Springs that it "should remember that state and local resources cannot be used by any organization affiliated with CAIR" and purports to place the city commission "on notice." ECF No. 41-3 at 2. Days later, AG Uthmeier again posted that "[a]ny entity that wants to do business or use state or local resources in Florida would be wise to dissociate from CAIR." ECF No. 41-5 at 2.

Of course, AG Uthmeier is not a Defendant in this action, nor is he responsible for the EO. However, he is a member of the Domestic Security Oversight Council, subject to Defendant's directives in the EO, *see* ECF No. 24-4 at 4–5; § 943.0313(1)(a)3., Fla. Stat., the chief state legal officer, *see* Art. IV, § 4(b), Fla. Const., and Defendant's favorite familiar. While not determinative, AG Uthmeier's interpretation of and public statements concerning the EO lend further support to Plaintiff's evidence that the production company reasonably believed that compliance with the EO was not voluntary and that it "would be wise to dissociate from CAIR." *Id.*

*See Backpage.com, LLC*, 807 F.3d at 231 (noting that a sheriff's attempt to "suffocate[e]" Backpage by "depriving the company of ad revenues by scaring off its payment-service providers" is akin to "killing a person by cutting off his oxygen supply rather than by shooting him"). This violates the First Amendment. *Vullo*, 602 U.S. at 194.

This Court recognizes, as it has before, that the Supreme Court has provided no clear standard of review once First Amendment coercion is identified. *See Floridians Protecting Freedom, Inc. v. Ladapo*, 754 F. Supp. 3d 1165, 1176 n.6 (N.D. Fla. 2024) (Walker, C.J.). In *Bantam Books*, the Court held that coercive threats created a system of prior restraints, which carried a "a heavy presumption against its constitutional validity." 372 U.S. at 69. *Vullo*, considered at the motion to dismiss stage, found that the plaintiff "state[d] a claim that the government violated the First Amendment through coercion of a third party," but did not provide a framework for analyzing such a violation. 602 U.S. at 191.

But here, inasmuch as the Supreme Court has suggested some heightened review applies given the "heavy presumption" against the constitutional validity of coercive threats, Defendant fails to justify his action with respect to Plaintiff.[12]

---

[12] In arguing that the EO is constitutional inasmuch as it touches only third parties' conduct and not speech, Defendant is mixing apples and oranges. With respect to a First Amendment coercion claim, the inquiry focuses on the would-be speaker's speech that is suppressed via government coercion of a third party. The focus is not on the coerced third party's speech. *See Vullo*, 602 U.S. at 191 ("*Bantam Books* provides the right analytical framework for claims that the

16

Defendant resorts to proclamations that "Florida is entitled to attempt to stamp out

terror," ECF No. 37 at 32, and that he "made an informed judgment about terrorist

---

government has coerced a third party to violate the First Amendment rights of another."). This framework, as articulated by the United States Supreme Court, binds this Court and all other courts in this country, and this Court rejects Defendant's attempt to distort the analysis.

Take *Vullo*, for example, where the head of New York's insurance regulator sought to "combat the availability of firearms [in New York], including specifically by weakening the NRA." 602 U.S. at 183. To do so, the regulator targeted insurance companies doing business with the National Rifle Association and urged them to cut ties with the pro-2nd Amendment group. The state regulator was not targeting the insurance companies' speech, but rather, the insurance companies' conduct of underwriting policies for the NRA. Given these facts, the Supreme Court held that the NRA had stated a plausible claim for relief based on the regulator's alleged coercion of insurance companies to suppress the NRA's speech in the state of New York.

Defendant also argues that the EO addresses conduct, not speech, and therefore "does not implicate the First Amendment at all." ECF No. 37 at 32–33. This argument is disingenuous at best. Even if one is distracted by Defendant's suggestion that the focus should be on whether the EO implicates the third party's speech, and not Plaintiff's speech, the EO does just that. The terms of the EO cut off the provision of essentially any government benefit—and, indeed, any benefit from private regulated entities—for anyone providing material support to CAIR—which includes the provision of "expert advice or assistance." *See* ECF No. 24-4 at 5; *see also* § 775.33(1)(c), Fla. Stat. A third party who sought to provide such expert advice or assistance—for example, a lawyer who would otherwise provide CAIR with legal advice—could arguably have their own claim for relief based on this EO. *See, e.g.*, *Al Haramain Islamic Foundation, Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 1001 (9th Cir. 2012) (holding that content-based prohibition on speech violated First Amendment rights of third-party organization that wished to engage in, among other things, coordinated press releases and press conferences with Oregon chapter of international non-profit promoting greater understanding of Islam that had been deemed a "specially designated global terrorist" pursuant to executive order issued in the wake of September 11, 2001). But that is not the claim before me now and this Court is not conflating such a scenario with the coercion claim at issue in Plaintiff's motion.

In short, this case presents the quintessential First Amendment coercion claim analogous to the book publishers who sued to stop the Rhode Island Commission to Encourage Morality in Youth from coercing book distributors to stop distributing the publisher's books in *Bantam Books*, and the National Rifle Association who sued to stop the state of New York from coercing insurance companies to stop underwriting policies for the NRA in *Vullo*. Neither the book distributors nor the insurance companies sued to stop the coercion—the publishers and the NRA sued because the suppressed speech at issue belonged to the publishers and the NRA, as the suppressed speech, here, belongs to CAIR.

17

organizations and how to best protect the citizens of Florida," *id.* at 34. But without explaining why this matters to overcome the "heavy presumption against [the EO's] constitutional validity," *Bantam Books*, 372 U.S. at 69, such statements are mere *ipse dixit*.

This Court need not determine whether intermediate scrutiny or strict scrutiny applies in this case because, under either standard, Defendant fails to point to any evidence justifying his indirect censorship of Plaintiff's speech. Instead, assuming some form of heightened scrutiny applies, Defendant merely pays lip service to heightened review in declaring, in conclusory fashion, that "[t]he EO's denial of government benefits to entities that materially support designated terrorist organizations is the least restrictive means of achieving," Defendant's "compelling interest" in "protection of public health and safety." ECF No. 37 at 34. But Defendant offers no evidence to show how cutting off benefits to third parties who engage with Plaintiff in any way furthers an interest in protecting public health and safety.

Lastly, Defendant contends that to the extent "any speech is involved, . . . the EO nevertheless passes muster." ECF No. 37 at 33. Defendant relies heavily on *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), to suggest this Court must defer to Defendant's unilateral decision to name Plaintiff a "terrorist organization." But Defendant is wrong to suggest that his independent decision to call Plaintiff a

18

"terrorist organization" in an Executive Order is entitled to the same deference afforded to the United States Secretary of State's designation in *Holder*. Defendant cites no precedent to support his contention that he has absolute authority to name any individual or entity a terrorist or terrorist organization and direct others to withhold any government benefit from them based on his unilateral decision to designate them as such.

*Holder* offers no help here either, as the authority to designate a foreign terrorist organization under federal law is subject to procedural safeguards that are absent from Defendant's decision to name Plaintiff a terrorist organization. *See* 561 U.S. at 9 (citing 8 U.S.C. §§ 1189(a)(1), (d)(4), (c)(1)). Here, Defendant essentially insists on a presumption of regularity as to his designation without the process that accompanies such a designation under federal law. In short, Defendant has unilaterally declared via executive order that Plaintiff is a terrorist organization, with no substantive explanation of his authority to do so, no legislative involvement, and no mechanism for judicial review. Further, even if this Court looked beyond these glaring distinctions, the Court in *Holder* explicitly "[did] not suggest that Congress could extend the same prohibition on material support at issue here to domestic organizations," such as Plaintiff. *Id.* at 39.[13]

---

[13] Likewise, Defendant relies on other cases discussing the federal Executive's authority in matters of national security and immigration to support his contention that his EO is entitled to

To be clear, this Court recognizes that Defendant, as Governor, has the authority to issue Executive Orders in myriad circumstances, and his judgment in doing so is often entitled to deference. *See, e.g.*, Art. IV, § 7(a), Fla. Const. (authorizing Governor to issue an executive order suspending from office any state officer not subject to impeachment for any number of enumerated grounds); *see also League of Independent Fitness Facilities and Trainers, Inc. v. Whitmer*, 81 F. App'x 125, 126–29 (6th Cir. 2020) (describing deferential review of challenged executive order closing fitness facilities during COVID-19 pandemic). The Florida Legislature has even authorized the Governor to issue executive orders as part of the Governor's emergency management powers. *See* § 252.36(1)(b), Fla. Stat. During an emergency, such executive orders "must be limited to a duration of not more than 60 days," but "may be renewed as necessary during the duration of the emergency." *Id.* "A state of emergency must be declared by executive order or proclamation of the Governor if she or he finds an emergency has occurred or that the occurrence or

---

deference. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667 (2018). But these cases involve the power of the federal executive—the President of the United States—in a context uniquely within the federal government's control. *See Estrada v. Becker*, 917 F.3d 1298, 1303 (11th Cir. 2019) ("[T]he Constitution itself preempts any state effort to regulate immigration, even if Congress has not expressly or impliedly preempted the state regulation." (citation omitted)); *see also Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053 (9th Cir. 2014) (directing district court to issue preliminary injunction against enforcement of Arizona's policy, in accord with Arizona Governor's executive order, targeting DACA recipients). While he gave it the good ol' college try, Defendant is not the president. Nor has he cited any authority to suggest this Court must defer to his judgment as a state governor in matters of national security for the same or similar reasons articulated in *Trump v. Hawaii* or *TikTok Inc. v. Garland*, 605 U.S. 56 (2025).

the threat thereof is imminent." § 252.36(2), Fla. Stat. Executive orders issued pursuant to the Governor's statutorily authorized emergency management powers are subject to certain requirements and may be terminated by the Legislature at any time. *See id*.; §§ 252.36(3)–(4), Fla. Stat.

And while caselaw counsels this Court not to second guess the "difficult line-drawing" elected officials undertake during emergencies, *Whitmer*, 814 F. App'x at 129, such deference is not unlimited. The Eleventh Circuit has recognized that "just as constitutional rights have limits, so too does a state's power to issue executive orders limiting such rights in times of emergency." *Robinson v. Attorney General*, 957 F.3d 1171, 1179 (11th Cir. 2020). "So, while states and the federal government have wide latitude in issuing emergency orders to protect public safety or health, they do not have *carte blanche* to impose any measure without justification or judicial review." *Id*.

But here, Defendant's EO was not issued pursuant to Defendant's statutorily authorized emergency management powers. There has been no suggestion that Defendant has declared an emergency in the state of Florida with respect to CAIR's activities or alleged connections to the Muslim Brotherhood. Instead, Defendant simply urges this Court to give blind deference to his judgment in naming CAIR a "terrorist organization," while broadly gesturing to distinguishable cases that implicated emergency situations and afforded procedural safeguards that are not

present here. ECF No. 37 at 34–35 (citing *Holder* and *Hodel v. Va. Surface Mining Reclamation Ass'n.*, 452 U.S. 264 (1981)[14]). Political grandstanding does not an emergency make. Defendant's EO amounts to unconstitutional First Amendment coercion and Defendant has provided nothing to overcome the presumption of unconstitutionality.

Having determined that Plaintiff has demonstrated standing with respect to its First Amendment coercion claim and is substantially likely to succeed on the merits of that claim, this Court considers the remaining factors for preliminary injunctive relief.

## C

Plaintiff has also satisfied the remaining requirements for preliminary relief. Plaintiff faces irreparable injury because the EO coerces third parties into

---

[14] As noted above, the federal statute under review in *Holder* allowed for judicial review of the Secretary of State's foreign terrorist designation. And in *Hodel*, the Court upheld the Surface Mining Control and Reclamation Act of 1977, which allowed for summary administrative action in the form of "immediate cessation orders" to prevent mining disasters and protect public health and safety in emergencies. The Court held that the Act comported with the requirements of due process as it afforded mine operators "prompt and adequate post-deprivation administrative hearings and an opportunity for judicial review." 452 U.S. at 303. Although the Court noted that protection of public health and safety "is a paramount governmental interest," *id*. at 300, this interest justified summary administrative action in emergency cases "where only property rights are concerned." *Id*. at 302–03.

Insofar as Defendant simply cherry picks this language from *Hodel* to justify his own action, this Court is not persuaded that protecting public health and safety justifies singling out and de-platforming one of America's largest Muslim civil rights organizations based on some strained guilt-by-association theory in the same way that preventing an imminent mining disaster justifies pre-hearing deprivation of property.

suppressing Plaintiff's speech and, thus, curtails Plaintiff's First Amendment right to free speech. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *accord Honeyfund.com v. Governor of Fla.*, 94 F.4th 1272, 1283 (11th Cir. 2024); *see also Backpage.com, LLC*, 807 F.3d at 238–39.

Defendant's argument that Plaintiff's "delay" in moving for injunctive relief undercuts its claim of irreparable harm is unavailing. Plaintiff initiated the present challenge within a week of Defendant's issuance of the EO and subsequently moved for a preliminary injunction less than six weeks later. During that time, Plaintiff assembled a legal team and amended its claims in preparation for filing the instant motion. *See, e.g.*, ECF Nos. 4, 7, 10, 12, 14, 16, 18, 21. As Plaintiff explains, this time also allowed for Plaintiff to "meaningfully evaluate the actual consequences of the Executive Order, rather than merely speculate about potential injuries at the outset," and to "prepare the record necessary to support this motion." ECF No. 41 at 19. As this Court has previously explained, plaintiffs are allowed some time to consider their options and prepare their lawsuit and motion. *See Wood v. Fla. Dep't of Educ.*, 729 F. Supp. 3d 1255, 1286 (N.D. Fla. 2024). Under the unique facts of this case, Plaintiff's limited delay in filing for relief, similar to the one-month delay at issue in another case before this Court, "is akin to no delay." *See Austin v. Univ. of Fla. Bd. of Trustees*, 580 F. Supp. 3d 1137, 1174 (N.D. Fla. 2022) (Walker, C.J.),

23

*vacated and appeal dismissed*, No. 22-10448-GG, 2023 WL 5051221 (11th Cir. Mar. 20, 2023).

The balance of the equities and the public interest also favor preliminary relief. The irreparable injury faced by Plaintiff is "not outweighed by any threatened harm to Florida because the government has no legitimate interest in enforcing an unconstitutional law," and "an injunction is not contrary to the public interest because it is in the public interest to protect First Amendment rights." *Honeyfund.com*, 94 F.4th at 1283 (internal quotation marks omitted).

True, the State has a compelling interest in protecting public safety. And the State remains free to advance that interest by designating foreign terrorist organizations and prosecuting terrorism-related offenses in accordance with Florida Statutes, notwithstanding any injunction directed at the EO. Moreover, Defendant retains his emergency management powers to declare a state of emergency and issue executive orders and proclamations consistent with that authority. However, the asserted interest in protecting public safety, in the abstract and absent any indication that an emergency is imminent, does not give license to the Governor to threaten anyone wishing to do business in this state from giving a platform to Plaintiff's

speech.[15] Accordingly, Plaintiff has carried its burden on all four prerequisites to preliminary relief.

III

This Court next considers whether Plaintiff must secure a bond in furtherance of the preliminary injunction. Rule 65(c) provides that a "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to

---

[15] Defendant ends with the conclusory assertion that "blocking contracts and other government benefits to terrorist organizations and those who provide them material support . . furthers the health and safety of Floridians," ECF No. 37 at 37, to suggest that the public interest and balance of equities favor Defendant in this case. But this fails to take cognizance of the finding that Defendant's EO, as directed at CAIR and those who provide CAIR material support or resources, constitutes unconstitutional coercion in violation of the First Amendment.

Moreover, Defendant's unilateral decision to name CAIR a "terrorist organization," as explained above, is not entitled to the same deference as other such designations, given the complete lack of procedural safeguards giving rise to Defendant's designation. Indeed, even in emergency situations, which this case does not appear to involve, Defendant does not have *carte blanche* to so limit the constitutional rights of individuals and domestic organizations without justification.

And, finally, to the extent Defendant's conclusory assertion may be construed as an allusion to the government's right to choose what speech it wishes to subsidize, *see, e.g.*, *Rust v. Sullivan*, 500 U.S. 173 (1991), Defendant has neither developed such an argument in response to Plaintiff's motion, nor is such an argument persuasive in this case. This is not a case where the State has simply determined not to fund CAIR's activities. Instead, the EO applies to anyone who wishes to receive a contract, employment, funds, or *any other benefit or privilege*, from the named state agencies, local governments, and regulated entities. The EO sweeps far broader than merely limiting the expenditure of public funds and arguably includes restrictions on the use of public spaces and facilities otherwise made available to the public, etc. *See id*. at 199 ("[T]his Court has recognized that the existence of a Government 'subsidy,' in the form of Government-owned property, does not justify the restriction of speech in areas that have 'been traditionally open to the public for expressive activity,' or have been 'expressly dedicated to speech activity.' "). Accordingly, to the extent Defendant is implying that this is merely a government-subsidy case, that dog won't hunt.

25

have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). But "it is well-established that 'the amount of security required by the rule is a matter within the discretion of the trial court . . . [, and] the court may elect to require no security at all.' " *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs.*, 425 F. 3d 964, 971 (11th Cir. 2005) (alteration in original) (quoting *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. Unit B 1981)). Moreover, "[w]aiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right." *Curling v. Raffensperger*, 491 F. Supp. 3d 1289, 1326 n.25 (N.D. Ga. 2020) (quoting *Complete Angler, LLC v. City of Clearwater*, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009)). Here, the EO's unlawful impact on Plaintiff's First Amendment rights weighs against requiring a bond, so this Court waives the bond requirement.

IV

Next, having determined a preliminary injunction is warranted, this Court next addresses whether it will stay that injunction pending appeal. Stays pending appeal are governed by a four-part test: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *see also Venues Lines Agency*

26

*v. CVG Industria Venezolana De Aluminio, C.A.*, 210 F.3d 1309, 1313 (11th Cir. 2000) (applying the same test). Considering that this test is so similar to that applied when considering a preliminary injunction, courts rarely stay a preliminary injunction pending appeal. That rings true here. Because no exceptional circumstances justify staying this Order pending appeal, *see Brenner v. Scott*, 999 F. Supp. 2d 1278, 1292 (N.D. Fla. 2014) (Hinkle, J.) (issuing a rare stay of a preliminary injunction given the public interest in stable marriage laws across the country), this Court refuses to do so. Defendant has every right to appeal, and this Court sees no reason to delay Defendant in seeking an appeal by requiring him to file a motion to stay with this Court under Rule 62.

V

This Court acknowledges that equitable relief may not be "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Trump v. CASA*, 606 U.S. 831, 861 (2025). The injunctive relief here is limited accordingly. It only prevents the Defendant from enforcing the EO as to Plaintiff CAIR. It is not a universal injunction. It does not even enjoin Defendant's actions as to the *other* Plaintiff in this case, CAIR-FL, or the other organization named in the EO. It is therefore within the scope of this Court's authority and does not run afoul of *CASA*.

27

VI

It should be lost on no one that Defendant's EO targets one of America's largest Muslim civil rights organization for indirect suppression of speech. But, as we all know, it is easy for those in power to target minority groups with little pushback. Sadly, history teaches that it is often minority religious groups who find themselves in the crosshairs. And here, the Muslim community presents an especially easy target for Defendant, inasmuch as they make up less than 1% of Florida's population.[16]

Despite this troubling history and present circumstances, this Court is reminded of one of the most prominent expressions of religious tolerance by one of our Founders in George Washington's letter to the Hebrew Congregation in Newport, Rhode Island. *See* "George Washington to the Hebrew Congregation in Newport, Rhode Island, 18 August 1790," *Founders Online*, National Archives, https://founders.archives.gov/documents/Washington/05-06-02-0135.  Washington praised the nascent United States government, which he said, "gives to bigotry no sanction." *Id*. And quoting his favorite Bible verse, Washington invited the Hebrew Congregation—"the Children of the stock of Abraham, who dwell in this land, to

---

[16] Pew Research Center, 2025, "2023-24 U.S. Religious Landscape Study Interactive Database," https://www.pewresearch.org/religious-landscape-study/state/florida/ (last visited March 4, 2026).

It also pains this Court to have to point out that not all Muslims are terrorists.

continue to merit and enjoy the good will of the other Inhabitants; while every one shall sit in safety under his own vine and figtree, and there shall be none to make him afraid." *Id*.

Channeling Washington's clear expression of American hope, conservative columnist David French perhaps says it best. "Our nation is not a place—it never will be a place—where we all agree with one another, much less look like one another, or even come from a common culture. But we can live together as neighbors so long as we recognize one another's inherent dignity and worth." David French, *A Movie About America Broke My Heart*, New York Times (Feb. 8, 2026), https://www.nytimes.com/2026/02/08/opinion/shakers-quakers-testament-ann-lee.html.

The Constitution protects Plaintiff's speech just as it protects any other organization's lawful speech from suppression by governmental coercion of third parties. And Defendant has violated Plaintiff's rights by targeting it in his EO and threatening any who wish to provide material support or resources to Plaintiff with government consequences. This the First Amendment does not permit.

Accordingly,

**IT IS ORDERED**:

1. Plaintiff's motion for preliminary injunction, ECF No. 24, is **GRANTED**.

2.  Defendant must take no steps to enforce Executive Order Number 25-244 as it applies to Plaintiff CAIR until otherwise ordered. This preliminary injunction binds Defendant and his officers, agents, servants, employees, and attorneys—and others in active concert or participation with any of them— who receive actual notice of this injunction by personal service or otherwise.

3.  This injunction is effective immediately, without the posting of security, but Defendants may seek an order requiring the posting of security.

**SO ORDERED on March 4, 2026.**

**s/Mark E. Walker**
**United States District Judge**

30